**Gary BENN, Petitioner–Appellee,**

v.

**John LAMBERT, Superintendent of the Washington State Penitentiary, Respondent–Appellant.**

**No. 00–99014.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 5, 2001.

Filed Feb. 26, 2002.

**1044**

Suzanne Lee Elliott, & David B. Zucker-man, Seattle, WA, for the petitioner-appellee.

John J. Samson, & Donna H. Mullen, Assistant Attorneys General, Olympia, WA, for the respondent-appellant.

Before: REINHARDT, TROTT and W. FLETCHER, Circuit Judges.

## OPINION

REINHARDT, Circuit Judge.

The State of Washington, through the superintendent of the Washington State Penitentiary, appeals the district court's decision to grant Gary Michael Benn's habeas corpus petition, arguing that the district judge erred in holding that the Washington State Supreme Court decision was contrary to or involved an unreasonable application of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. Because we hold that the state court's decision that there was no *Brady* violation in Benn's case constitutes an unreasonable application of clearly established Supreme Court law, we affirm.

## I. FACTUAL BACKGROUND

On February 10, 1988, Gary Michael Benn made a 911 call to the Pierce County Sheriff's Department from the home of his half-brother, Jack Dethlefsen, and reported finding his half-brother's body as well as the body of his half-brother's friend, Michael Nelson. Officer Junge of the Pierce County Sheriff's Department arrived at the scene three minutes later and observed the bodies of the two victims on the floor in the living room. Both men had been shot once in the chest and once in the back of the head. He checked them for vital signs and found none. The bodies were still warm and bleeding, suggesting that both men had been killed recently.

There was a bullet hole in the couch in the living room consistent with someone having been shot while on the couch. There were also bloodstains that matched Dethlefsen's blood type on both the couch itself and on a newspaper that was on it. The medical examiner testified that Dethlefsen was shot in the chest while on the couch because only the chest wound would have allowed him to move around and end up on the floor where the police found him.

There was a .45 caliber handgun on the floor between the two bodies and a baseball bat next to Dethlefsen's body. Dethlefsen's head rested next to a gun cabinet and the glass face of the cabinet, which had a shotgun in it, had been broken. Police found a boot print that matched Benn's boot on a piece of broken glass next to Dethlefsen's elbow. There was also blood on one of Benn's boots with spatter patterns consistent with Benn's having shot Nelson in the head while standing next to his body.

Benn was charged with two counts of premeditated murder with the aggravating circumstance that the murders were part of a common scheme or single act, and was given notice of the government's intention to seek the death penalty. The defense conceded at trial that Benn had shot both Dethlefsen and Nelson, but claimed that the shootings were in self-defense after a spontaneous argument between Benn and Dethlefsen. The prosecution, however, contended that Benn had planned the killings primarily in order to cover up his participation with the victims in an arson-insurance-fraud scheme. At trial, the prosecution relied heavily on various inculpatory statements that Benn had allegedly made to Roy Patrick, a "jailhouse infor-

mant" who was in Benn's cell block while Benn was awaiting trial, as well as on highly circumstantial evidence relating to the alleged arson.

## A. ADDITIONAL EVIDENCE AT TRIAL

On the day of the shootings, Benn had been at Larry Kilen's barbershop before he went to Dethlefsen's house. While at the barbershop, Benn spoke to Dethlefsen on the phone and Kilen heard him say "What the hell is going on? I will be right back—I will be right there. What's the matter? What is that?" Benn told Kilen that Dethlefsen was drunk and wanted him to come over because he had fallen down. Multiple witnesses at trial testified that Dethlefsen was an alcoholic, and his autopsy revealed that he had a blood alcohol content of 0.07 at the time of his death. Similarly, Nelson's autopsy revealed that he had a blood alcohol content of 0.11.

Benn denied that he went to Dethlefsen's house with the intention of harming either Dethlefsen or Nelson. A police search of Benn's car revealed that he had a .22 caliber pistol in the car that he had not taken inside the house with him. Benn did not testify at the trial and much of his version of the events was presented through statements he made to his brother, Monte Benn ("Monte").

Monte testified that Benn had described the following series of events to him: When Benn went into Dethlefsen's house on the day of the shootings, he found a piece of paper on the kitchen counter with Gail Fisk's phone number on it. Fisk was Benn's ex girlfriend with whom he had been trying to reconcile. Benn thought that Dethlefsen and Nelson were harassing Fisk because he had seen Nelson's car at Fisk's house on occasion. Benn had questioned Dethlefsen about Fisk previously but Dethlefsen had denied harassing her. After Benn discovered the note with Fisk's phone number on it, he took the note into the living room and confronted Dethlefsen. In response, Dethlefsen said, "Well Benny, you got me" and reached for the .45 caliber gun that he routinely kept on his living room coffee table. Benn then grabbed the gun and shot Dethlefsen in self-defense. After being shot, Dethlefsen moved toward the gun cabinet. Nelson then got up and threw a beer can at Benn. Benn remembered shooting Nelson, but did not remember much else.

Monte testified that he got the impression that the shooting was in self-defense. He also told the jury that Dethlefsen had a reputation for violence in the community. Other evidence presented at the trial corroborated parts of Benn's story. Experts testified that the path of the bullet that struck Dethlefsen's chest and then entered the back of the couch was consistent with Dethlefsen being in the act of rising from the couch at the time he was first shot. Moreover, Deputy James Jones testified that Dethlefsen probably broke the glass face of the gun cabinet "as he fell ... after being wounded" or while he was "trying to get a weapon." The defense theory was that Benn shot Dethlefsen a second time because Dethlefsen was trying to get another gun. During the investigation, the police also found an empty beer can underneath Nelson's right knee. This was consistent with Benn's claim that Nelson threw a beer can at him while he was standing next to the living room table near where the bodies were found.

Roy Patrick, a "jail house informant" who shared a cell with Benn when Benn was awaiting trial, testified on behalf of the prosecution. According to Patrick's testimony, Benn confessed to him and asked Patrick to help him find someone "on the outside" who would be willing to take the blame for the murders. Patrick testified that Benn drew diagrams of the murder scene and gave him details about the murder to relay to the person he found

so that the person's statements would be believable.

The prosecution's theory was that the shootings were part of a common plan or scheme. Patrick's testimony provided critical support for that theory. Specifically, he testified that Benn told him about his involvement in a conspiracy with Dethlefsen and Nelson to perpetrate an insurance fraud. According to Patrick's testimony, Benn, Dethlefsen, and Nelson staged a "burglary" of Benn's trailer and collected the insurance. Then, a few months later, they burned down the trailer and collected insurance again. Both times, however, Benn refused to share the proceeds with Dethlefsen and Nelson. Nelson and Dethlefsen then threatened to disclose the crimes to the police, and Benn killed them to keep them from doing so.

Benn did in fact report a burglary of his trailer on October 12, 1987, but the only evidence of an insurance fraud with respect to that burglary (aside from Patrick's testimony) was the fact that Benn reported that ivory carvings were taken in the burglary and the police recovered some ivory figures from Dethlefsen's bedroom closet after he was killed. After the trial, however, a friend of the family stated that the half-brothers both owned ivory figures from Alaska.

Similarly, there was a fire at Benn's trailer on December 11, 1987, but there was little, if any, evidence, aside from Patrick's testimony, that the fire was intentionally started. There was testimony that Dethlefsen, an electrician, had worked on the furnace in Benn's trailer and that some possessions that Benn normally kept in the trailer were not there on the day of the fire. Additionally, Benn did tell Monte that he was nervous about fire insurance fraud charges being filed against him because he claimed more than he should have after the fire, but he never told Monte that he had started the fire. The prosecution

emphasized that Benn sent in a payment for his home insurance on the day of the fire. According to the insurance agent, however, the payment was not late and it was to cover January and February insurance. Benn had already made payments to insure the trailer for December, the month of the fire.

The defense attempted to prevent the arson-insurance-fraud theory from being mentioned at trial by arguing in a motion in limine that there was no evidence of arson. In ruling that the information was admissible, the trial court said "This is probably the key decision in this case." The trial judge went on to state that:

> So far as the probative value is concerned, it goes to the very heart of the case. It is the kind of evidence that the State must and needs to prove if it's going to prove the aggravating factor that is involved in this case, and if it is going to prove premeditation. Without it, the State doesn't have a case for aggravated murder, or maybe doesn't have a case for pre-meditated murder. It is an essential ingredient.

In addition to testifying about Benn's burglary-arson-insurance-fraud motive, Patrick also testified that Benn wanted to kill Dethlefsen because Dethlefsen had removed Benn from his will and had given Benn's portion of his estate to a friend named William Hastings. Hastings testified that he was listed as a beneficiary in Dethlefsen's will, although there was nothing in the estate because Dethlefsen was so much in debt. Hastings did, however, get $40,000 from a separate life insurance policy. Patrick did not say anything about a life insurance policy.

Finally, Patrick testified that Benn told him that he had tried to hire someone named "Pete" to kill Dethlefsen for $500 but then changed his mind. Benn told Patrick that he wanted whoever took the rap for the murders to kill Pete. The pros-

ecution emphasized this point in closing arguments noting that Benn tried to "reach out" and kill someone from prison.

The defense sought to impeach Patrick on cross-examination by establishing that Patrick was in jail with Benn because he had pled guilty to and was awaiting sentencing for second-degree arson. There was a 6 to 12 month sentencing range for this offense and the prosecution had originally asked for a 9 month sentence. Based on Patrick's cooperation, he received 6 months rather than nine. With good time credits for his work in prison, however, Patrick would have needed to serve only an additional 35 days even if he had received the 9 month sentence originally sought by the prosecutors. Moreover, the prosecution downplayed the importance of the sentence reduction in closing arguments by stating "[t]he reward that he got was that in a 6 to 12 month sentence, he got six months instead of nine months. Big reward."

The defense also sought to impeach Patrick by eliciting testimony that Patrick had been ordered to pay costs and restitution for his arson conviction and had failed to do so; that he had previous convictions for fraud by wire, burglary, and arson; that he had been paid for his testimony as an informant; that the State was paying for his food and hotel expenses while he was testifying; and that the subpoena used to bring Patrick to the State of Washington for Benn's trial protected him from arrest or criminal process while he was in town.

During the trial, a third party told the defense that the police had executed a warrant to search Patrick's hotel room based on a tip that Patrick was dealing drugs from the room. His room had been searched and crack pipes, a bong, rolling paper, a razor blade, and a copper brillo pad were recovered, but no arrests were made. The prosecution knew about this search and failed to disclose information about it to the defense. The defense did not learn the name of the confidential informant who had provided the information for the warrant until after the trial. At a later evidentiary hearing, the informant, Melvin Stevens, testified that Patrick was doing drugs while he was in Washington for Benn's trial. Stevens also said that Patrick told him that Benn did not commit the murder, but that Patrick knew enough to convict him and needed the money.[1]

Walter "Pete" Hartman testified on behalf of the prosecution and said that Benn offered to pay him to kill Dethlefsen. Hartman said that he initially thought it was just talk and that he never took Benn up on his offer.[2] Denver Carter, a former

---

**1.** As part of its factual findings following the post-conviction evidentiary hearing, the Pierce County Superior Court found that Stevens was not a credible witness.

Sherrie Woodard was one of the individuals who was with Patrick when his hotel room was searched. She testified at the state court evidentiary hearing that Patrick told her that he planted drugs in places in order to make busts when he was working as an informant and that Detective Padukiewicz, Patrick's supervisor, knew about it. She also said that Patrick would keep some of the drugs from the busts and that the detectives knew about this as well. When Woodard went to Patrick's hotel room during the Benn trial, she saw a large amount of money that Patrick said the police had given to him. Patrick also suggested to her that he was willing to lie to get out of trouble. She said Patrick's reputation for truthfulness was not very good.

Upon learning about the hotel room search during the trial, the defense moved for a continuance to have the opportunity to question Woodard and others involved in the hotel room search; however, the judge denied the motion.

**2.** Benn directed his counsel at trial not to cross-examine Hartman "for fear that his family would be harmed." Benn told his lawyer that he was convinced that Hartman was threatening his family even though his family said there were no such threats. The

roommate of Benn's, testified for the prosecution as well and said that Benn admitted to him that he had shot Dethlefsen and Nelson. At one point, Carter said that Benn told him that a man named "Pete" owed him a favor and that Benn had a job for him, but that Benn never mentioned what the job was. Benn told Carter that, when Benn called Dethlefsen's house on the day of the murder, no one was supposed to answer the phone, but Benn never explained what that meant.

After deliberating for approximately seven and a half hours, the jury returned a verdict of guilty on both counts of premeditated murder. The jury also found that the murders were part of a common scheme or plan but did not find that they were the result of a single act of the defendant. The jury then recommended that Benn be sentenced to death, and he was.

## B. EVIDENCE REVEALED AFTER TRIAL

Although on December 16, 1988, over two years before the trial began, the defense requested that the prosecution disclose all evidence in its possession that was favorable to the defendant, a great deal of impeachment evidence relating to Patrick, as well as important exculpatory evidence relating to the alleged arson-insurance-fraud allegation, was not turned over to the defense until after both the guilt and penalty phases of the trial had ended.

### (1) *Impeachment Evidence Related to Patrick*

Even though the prosecuting attorneys had taken their first statements from Patrick over a year before the trial, Patrick's identity was not disclosed to the defense until the day before trial when he was added to the witness list.[3] Pierce County Assistant Prosecuting Attorney Michael Johnson lied to the defense and stated that Patrick's identity could not be disclosed because he was in a witness protection program. It was later discovered that he was never in such a program.

The day that Benn's trial was scheduled to begin, the defense brought to the court's attention the fact that *Brady* material relating to Patrick had not been provided. The defense noted specifically that it did not have information about Patrick's prior contacts with the police, including whether Patrick had made statements in the past that had turned out to be incorrect. The trial court agreed and ordered the prosecution to turn over any written material relating to Patrick's contacts with law enforcement in the year prior to the murders. No such material was ever produced. The court also stated that "the prosecutor would have an obligation to tell [the defense] if there's prior situations where the informant had not been truthful." Prosecutor Johnson acknowledged this obligation and stated that they "ha[d] been notified of no such situations, your Honor." The prosecution never turned over any information that Patrick had en-

---

defense called no witnesses until rebuttal because of these fears. During the trial, Benn's competency was re-evaluated three different times with conflicting expert opinions about whether he was or was not competent. Each time, the trial court ultimately deemed him competent and allowed the proceedings to continue. Benn learned during the post-conviction proceedings that he could have impeached Hartman with the witness's admitted

intoxication and hearing difficulties at the time he spoke with Benn.

3. Walter "Pete" Hartman and Denver Carter were also surprise witnesses who were not on the original witness lists. Both of these witnesses were "discovered" by the prosecution during the trial, well after opening statements had been delivered, and after the defense theory had been presented to the jury.

gaged in improper conduct while acting as an informant. It was later discovered that the prosecution did not attempt to obtain this information from any of the police detectives working on the case. Additionally, the defense later discovered that Detectives Ronald Lewis and Thomas Padukiewicz, both of whom supervised Patrick while he was assisting in law enforcement investigations, knew that Patrick had stolen both drugs and money during drug busts and that he had lied to the police about it. The defense was never told about this. Detective Padukiewicz had even gone so far as to write up a "deactivation memo" stating that Patrick could no longer work as an informant because he would not abide by department rules. The defense was never told about Patrick's deactivation.

The defense was also not informed that Patrick had broken into the evidence room of the California Bureau of Narcotics Enforcement while working as an informant and had stolen drugs that the police had previously seized. Nor was the defense told that, as a result of this offense, Patrick was charged with burglary and numerous counts of obstruction of justice and ultimately pled guilty to burglary.

The state did not inform defense counsel that Patrick had admitted to making false charges while in prison on a fraud conviction in the early 1980's. Patrick had believed that he could get his time reduced if he reported the presence of firearms within the prison. He therefore had shotguns smuggled into the prison and then told the officials that he had found them. The prison officials discovered the scheme, and Patrick's prison sentence was extended.

The prosecution failed to disclose that Patrick was given $150 during Benn's trial as an advance payment for a video-tape that Patrick claimed he had in his possession, showing a prostitute being murdered by Benn and several other men. Patrick said that the video was related to the "Green River case," a high profile serial murder investigation. Patrick never produced the tape, and the detectives working on the case said that they thought Patrick was lying about its existence, and that his story about Benn being involved in the "Green River" murders was "trash." The detectives also stated that they had spoken with the prosecutors in Benn's case about the tape and the money that was paid to Patrick. The prosecution, however, never told the defense about either the false tale of a "Green River" murder tape or the payment that Patrick had received.

When Patrick was in Washington for Benn's trial, he was stopped for a traffic offense and arrested because of some outstanding warrants. He called Prosecutor Johnson from jail, and Johnson ensured that he was released without being charged. The defense was never told about the arrest or Johnson's actions.

During the trial, the Fife County Police Department submitted police reports to the Pierce County prosecutor requesting that Patrick be charged with burglary. The prosecutor's office entered an "NCF" (no charges filed) the same day that closing arguments ended in the penalty phase of Benn's trial. This fact was never disclosed to the defense.

During Benn's trial, the prosecution arranged to postpone the filing of a warrant that was going to be issued because Patrick had violated probation. Patrick's probation officer had been told by the prosecutors not to do anything on the violation report or the order to issue a bench warrant. The warrant did not issue until two weeks after the verdict in Benn's case. The prosecution never told the defense that it had prevented the issuance of the warrant.

Testimony at the state habeas evidentiary hearing revealed that Patrick had acted

as an informant in a murder case prior to Benn's trial, although at the trial he denied ever having done so previously. The defense was never told that Patrick had been an informant in a prior murder case and that in that case also he had claimed that the defendant had confessed to him while in jail.

At trial, Patrick denied that he used drugs while acting as an informant; however, testimony at a post-conviction evidentiary hearing revealed that he continuously used drugs during his time . as an informant and that the police knew about it. This information was not disclosed to the defense.

### (2) *Exculpatory Evidence Related to the Arson–Insurance– Fraud Allegation*

The prosecution turned over two reports describing the December 11, 1987 fire at Benn's trailer. The first was a February 12, 1988 report tentatively concluding that the fire was an accident. After this report was prepared, Deputy Fire Marshal Ted Thompson and Electrical Inspector Walter Erickson conducted a more thorough re-examination of the site. After the re-examination, Thompson and Erickson both conclusively determined that the fire in Benn's trailer was accidental. According to Erickson, the Coleman furnace in Benn's trailer was the same make and model as the one that he owned, and this particular make and model had been recalled by the manufacturer due to a flaw that causes fires. Moreover, Fire Marshal Thompson concluded that the fire was accidental because:

First, it is not uncommon for electrical heaters in older mobile homes to accidentally malfunction and cause fires. Second, there were no accelerants, such as gasoline in the trailer. Third, it is not uncommon for electrical heaters to malfunction in the winter .... Fourth, I opened up the front of the electrical heater and everything appeared to be in place; I observed nothing suspicious.... My fifth reason for determining the fire was accidental, not arson, was that I observed only one locale where the fire originated (the furnace), not multiple locales. Sixth, I saw no signs of forced entry, which are indicative of arson.

After the re-examination, a second and more detailed report was prepared on March 30, 1988. The second report, which was turned over to the defense, was misleading. Its only reference to the conclusions of Fire Marshal Thompson and Electrical Inspector Erickson was in a section stating that there was "no fault or failure" of the lead electrical wire and no evidence of tampering with the fuse panel. The March 30, 1988 report did not state that both the fire inspector and deputy marshal had concluded that the fire was accidental and could not have resulted from arson. Rather, it offered no definitive conclusion regarding the cause of the fire. It did not state that there had been a manufacturer's recall of this type of furnace and that it was the same type of furnace that Erickson had in his own home. To the contrary, it suggested that Coleman furnaces did not cause fires. Specifically, the March report stated that Al Pearson, the furnace technician, said that "he could find and think of no situation in which a furnace[such as a Coleman] had caused a fire in a mobile home." Finally, the report did not relate the six reasons Fire Marshal Thompson gave for concluding that the fire was accidental.

## II. PROCEDURAL HISTORY

Benn appealed his convictions as well as his capital sentence. His direct appeals were denied by the Washington Supreme Court in *Washington v. Benn*, 120 Wash.2d 631, 845 P.2d 289 (1993), with

three justices dissenting. Benn then initiated state habeas corpus proceedings and an evidentiary hearing was held. The Washington Supreme Court denied the state habeas petition. *In re Benn*, 134 Wash.2d 868, 952 P.2d 116 (1998). It did not deny that the state improperly withheld evidence to which Benn was entitled, but it found that the state's actions were not prejudicial. *See id.* Two justices dissented, arguing that Benn should have received a new trial because of the state's failure to turn over exculpatory and impeachment material. *Id.*

Benn filed a federal habeas petition in the Western District of Washington alleging 22 errors, including his allegation that the prosecution withheld crucial exculpatory and impeachment evidence in violation of his due process rights. The district court agreed with Benn that material evidence had been withheld in violation of his constitutional rights, granted his petition for a writ of habeas corpus, and ordered a new trial without even considering the 21 other grounds of error asserted in his petition. *Benn v. Wood*, No. C98–5131RDB, 2000 WL 1031361 (W.D.Wash. June 30, 2000). The state now appeals the district court's decision. We affirm the district court.

## III. STANDARD OF REVIEW

■ We review a district court's decision to grant a petition for a writ of habeas corpus *de novo. Miles v. Prunty*, 187 F.3d 1104, 1105 (9th Cir.1999). Because Benn's petition was filed after April 24, 1996, the amendments to 28 U.S.C. § 2254 under the Anti–Terrorism and Effective Death Penalty Act ("AEDPA") apply. *Van Tran v. Lindsey*, 212 F.3d 1143, 1148 (9th Cir.2000).[4]

■ Under AEDPA, a federal court may grant a writ of habeas corpus to a state prisoner only if the state court's decision is "contrary to, or involve[s] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or is "based on an unreasonable determination of the facts in light of the evidence presented" in the state courts. 28 U.S.C. § 2254(d). A state court decision is "contrary to" clearly established federal law if it "failed to apply the correct controlling authority from the Supreme Court." *Shackleford v. Hubbard*, 234 F.3d 1072, 1077 (9th Cir.2000); *see also Williams v. Taylor*, 529 U.S. 362, 405–07, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Packer v. Hill*, 277 F.3d 1092 (9th Cir.2002).[5] A

---

**4.** In arguing that the district court should be reversed, the state asserts that the district court failed to state explicitly in its opinion how the state court decision was contrary to federal law and that this failure shows that the district court did not apply the AEDPA standard. The state is wrong for two reasons. First, the district court carefully described the AEDPA standard in a full paragraph at the beginning of its opinion and stated that Benn was not entitled to relief unless that standard was satisfied. *Benn v. Wood*, No. C98–5131RDB, 2000 WL 1031361, at *2 (W.D.Wash. June 30, 2000). After expressing his reluctance to overturn a Washington Supreme Court decision, Judge Burgess granted Benn habeas relief because the prosecution withheld material evidence in violation of

*Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and because the importance and sheer amount of withheld evidence *"seriously"* undermined confidence in the verdict. *Benn*, 2000 WL 1031361, at *2. Thus, it appears that the district court did apply the AEDPA standard. Second, our review of the district court's decision is *de novo. Miles v. Prunty*, 187 F.3d 1104, 1105 (9th Cir.1999). Thus, any error in applying the AEDPA standard would be of no consequence on this appeal.

**5.** The addition, deletion, or alteration of a factor in a test established by the Supreme Court also constitutes a failure to apply controlling Supreme Court law under the "contrary to" clause of AEDPA. *See Williams v. Taylor*, 529 U.S. 362, 405–06, 120 S.Ct. 1495,

**1052**

state court decision constitutes an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal rule ... but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407, 120 S.Ct. 1495.[6]

■ In *In re Benn*,[7] the Washington Supreme Court applied the rule in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny[8]—a rule clearly established by controlling Supreme Court precedent. Therefore, the state court ruling is properly analyzed under the "unreasonable application" clause of AEDPA. To be "unreasonable" under AEDPA, the Washington Supreme Court decision must leave us "with a 'firm conviction' that one answer, the one rejected by the[state] court, was correct and the other, the application of the federal law that the [state] court adopted, was erroneous—in other words that clear error occurred." *Van Tran*, 212 F.3d at 1153–54. When analyzing the state court decision to determine if there was "clear error," "we must first consider whether the state court erred; only after we have made that determination may we then consider whether any error involve[s] an unreasonable application of controlling law...." *Van Tran*,

146 L.Ed.2d 389 (2000); *Brown v. Mayle*, 283 F.3d 1019, at 1039 (9th Cir.2002).

**6.** In both "contrary to" and "unreasonable application" cases, the erroneous state court ruling must also satisfy *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (requiring that the error have had a substantial or injurious effect on the verdict). *See Packer*, 277 F.3d 1092 at 1102. Where, as here, however, the alleged error is a *Brady* violation, the petitioner need show only that the state court's *Brady* ruling was erroneous under AEDPA, because a *Brady* error *a fortiori* satisfies *Brecht*. *See Kyles v. Whitley*, 514 U.S. 419, 436, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ("[O]nce there has been *Bagley* error ... it cannot subsequently be found harmless under *Brecht*."); *Bagley*,

212 F.3d at 1155. Here, we conclude that the Washington Supreme Court erred in ruling that the prosecution's failure to disclose critical impeachment and exculpatory evidence did not violate *Brady* and its progeny. Because we also hold that the state court's ruling was clearly erroneous and thus objectively unreasonable under AEDPA, Benn is entitled to habeas relief.

## IV. THE WASHINGTON SUPREME COURT'S OBJECTIVELY UNREASONABLE *BRADY* ERRORS

### A. INTRODUCTION

■ In *Brady*, the Supreme Court held that the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194. Supreme Court cases following *Brady* clearly established that the defendant must prove three elements in order to show a *Brady* violation. First, the evidence at issue must be favorable to the accused, because it is either exculpatory or impeachment material. *See United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Second, the

473 U.S. at 678, 105 S.Ct. 3375 (holding that, in order to establish a *Brady* violation, a petitioner must show prejudice).

**7.** We look to the Washington Supreme Court's state habeas decision because, when conducting an AEDPA analysis, we examine the state court's last reasoned decision. *See Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n. 2 (9th Cir.2000).

**8.** The state court cited to and appears to have applied (albeit clearly erroneously) *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), and *United States v. Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), in addition to *Brady*.

evidence must have been suppressed by the State, either willfully or inadvertently. *See United States v. Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Third, prejudice must result from the failure to disclose the evidence. *See Bagley*, 473 U.S. at 678, 105 S.Ct. 3375.

■■■ Evidence is deemed prejudicial, or material, only if it undermines confidence in the outcome of the trial. *See Bagley*, 473 U.S. at 676, 105 S.Ct. 3375; *Agurs*, 427 U.S. at 111–12, 96 S.Ct. 2392.[9] For purposes of determining prejudice, the withheld evidence must be analyzed "in the context of the entire record." *Agurs*, 427 U.S. at 112, 96 S.Ct. 2392. Moreover, we analyze all of the suppressed evidence together, using the same type of analysis that we employ to determine prejudice in ineffective assistance of counsel cases. *See Bagley*, 473 U.S. at 682, 105 S.Ct. 3375 (opinion of Blackmun, J.);[10] *see also United States v. Shaffer*, 789 F.2d 682, 688–89 (9th Cir.1986) (analyzing collectively the prejudice resulting from the state's suppression of four different pieces of impeachment material).

■■■ The Supreme Court has not limited the *Brady* rule to cases in which the defense has made a pretrial request for specific evidence. *See Agurs*, 427 U.S. at 103–07, 96 S.Ct. 2392. In *Agurs*, the Court held that *Brady* applies where the defense makes a general request for exculpatory evidence and even where the defense does not make a request for such evidence at all. *See id.* at 106, 96 S.Ct. 2392. Thus, the terms "suppression," "withholding," and "failure to disclose" have the same meaning for *Brady* purposes. Similarly, the disclosure requirements set forth in *Brady* apply to a prosecutor even when the knowledge of the exculpatory evidence is in the hands of another prosecutor. *See Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) ("The prosecutor's office is an entity and as such it is the spokesman for the Government.").

■■■ Here, the state does not contest that it was required to disclose the extensive impeachment evidence pertaining to Patrick. It simply contends, as did the Washington Supreme Court, that the failure to produce that evidence did not result in prejudice under *Brady*. We conclude that the state court erred in that determination. Similarly, we conclude that it erred in holding that there was no *Brady*

---

**9.** The Supreme Court refers to the requirement that the defense establish that the suppressed evidence was prejudicial to the outcome as a "materiality" requirement and/or a "prejudice" requirement. *See Brady*, 373 U.S. at 87, 83 S.Ct. 1194 (requiring that the suppressed evidence be "material" to guilt or punishment); *id.* at 88, 83 S.Ct. 1194 (referring to the state's suppression of a confession as "prejudicial" to the defendant). The terms "material" and "prejudicial" are used interchangeably in *Brady* cases. Evidence is not "material" unless it is "prejudicial," and not "prejudicial" unless it is "material." Thus, for *Brady* purposes, the two terms have come to have the same meaning.

**10.** Justice Blackmun's comparison of the prejudice inquiry under *Brady* to that under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), was joined by Justice O'Connor. Justices Brennan and Marshall dissented arguing for an even stricter standard of materiality that would have required reversal in all cases in which the prosecution suppressed exculpatory or impeachment evidence unless it was clear beyond a reasonable doubt that the withheld evidence would not have affected the outcome. *See id.* at 704, 104 S.Ct. 2052 (Marshall, J., dissenting). Justice Stevens would have applied different standards of materiality depending on whether the defendant made a request for *Brady* information or not. *See id.* at 711, 104 S.Ct. 2052 (Stevens, J., dissenting). In a case such as Benn's, in which the defense did make a *Brady* request, Justice Stevens would have applied a stricter materiality standard as well. *See id.*

violation resulting from the prosecution's failure to disclose exculpatory evidence about the cause of the fire at Benn's trailer. Because we conclude that the suppressed impeachment evidence and the suppressed exculpatory evidence are each, standing alone, sufficiently prejudicial to merit relief under *Brady*, they are *a fortiori* sufficiently prejudicial when analyzed together. We therefore hold that the state court erred when conducting its *Brady* analysis. We also hold that the state court ruling was clearly erroneous and constitutes an "unreasonable application" of *Brady* and its progeny. Therefore, Benn is entitled to habeas relief.

**B.** THE PROSECUTION'S FAILURE TO DISCLOSE CRITICAL IMPEACHMENT EVIDENCE THAT COULD HAVE BEEN USED TO UNDERMINE PATRICK'S CREDIBILITY IS SUFFICIENT, STANDING ALONE, TO CONSTITUTE A *BRADY* VIOLATION.

The prosecution failed to disclose multiple pieces of critical impeachment information that could have been used to undermine the credibility of Patrick, a prosecution witness whose testimony was crucial to the state's claims of premeditation and common scheme or plan, as well as to the state's theory regarding Benn's principal motive for killing the two individuals. Because Patrick is a witness whose " 'reliability ... may well be determinative of guilt or innocence,' nondisclosure of evidence affecting [his] credibility falls within [the *Brady*] rule." *Giglio*, 405 U.S. at 154, 92 S.Ct. 763 (quoting *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)); *see also Carriger v. Stewart*, 132 F.3d 463, 479 (9th Cir.1997) ("Material evidence required to be disclosed includes evidence bearing on the credibility of government witnesses."); *Shaffer*, 789 F.2d at 689 ("[E]vidence affecting the credibility of a government witness has

been held to be material under the Brady doctrine.").

**(1) *Patrick's history of misconduct while acting as an informant***

The prosecution failed to disclose evidence of Patrick's persistent misconduct while acting as an informant, even though the trial judge explicitly ordered the state to disclose all such information to the defense. Specifically, the state failed to disclose: that Patrick, while acting as an informant, had stolen both drugs and money during drug busts and had lied to police about it; that a detective had written a deactivation memo stating that Patrick could no longer work as an informant because he could not be trusted to follow departmental rules; that Patrick, while acting as an informant, had broken into an evidence room and stolen drugs, resulting in burglary and obstruction of justice charges being filed against him; that Patrick had smuggled guns into a prison where he was housed, concealed his own involvement, and then told prison officials of the presence of the weapons in an effort to have his sentence reduced; and that although Patrick testified at trial that he did not ever use drugs, he continually did so during his time as an informant.

■ The state does not contest that this evidence was impeachment material that was suppressed by the prosecution. Rather, it contends that the suppressed material was cumulative and its suppression harmless because Patrick was sufficiently impeached by questions about his history as a paid informant in drug cases, his prior convictions, the reduction in his arson sentence, and the fact that the state was paying his motel and food bills. *See United States v. Vgeri*, 51 F.3d 876, 880 (9th Cir.1995) (undisclosed impeachment evidence is immaterial and cumulative when the witness is already sufficiently

impeached); *see also Ortiz v. Stewart,* 149 F.3d 923, 936 (9th Cir.1998) (same).

The undisclosed impeachment evidence in this case was substantial and was far more damaging to Patrick's credibility than the impeachment evidence available to the defense at trial. If anything, the police-sanitized version of Patrick's fifteen years of work as an informant increased his credibility in the eyes of the jurors. The jury was told only that the police routinely relied on Patrick for help with drug investigations. Information demonstrating that Patrick had regularly lied to the authorities while acting as an informant, was untrustworthy and deceptive, and was even willing to fabricate crimes in order to gain a benefit for himself would have severely undermined his credibility. The mere fact that a prosecution witness has a prior record, even when combined with other impeachment evidence that a defendant introduces, does not render otherwise critical impeachment evidence cumulative. *See, e.g., United States v. Steinberg,* 99 F.3d 1486, 1489–92 (9th Cir.1996) (holding that the government's failure to disclose that an informant had been involved in two illegal transactions involving counterfeit currency was material even though the informant had been impeached through questioning about a plea agreement that he had made with the government). In cases in which the witness is central to the prosecution's case, the defendant's conviction indicates that in all likelihood the impeachment evidence introduced at trial was insufficient to persuade a jury that the witness lacked credibility. Therefore, the suppressed impeachment evidence, assuming it meets the test for disclosure, takes on an even greater importance.

For example, in *Carriger v. Stewart,* 132 F.3d at 479, we held that information that an informant had been unreliable in the past constituted material impeachment evidence for *Brady* purposes. Like Patrick, the informant in *Carriger* came to the police with an offer of information and received a benefit for providing the information. *Id.* at 465. We stated that "[w]hen the state decides to rely on the testimony of such a witness, it is the state's obligation to turn over all information bearing on that witness's credibility." *Id.* at 480. As we said, "[t]his must include the witness's criminal record, including prison records, and any information therein which bears on credibility." *Id.* Like Patrick, the informant in *Carriger* was impeached at trial with evidence of prior convictions. In fact, the defense's impeachment of the informant in *Carriger* was more extensive than Benn's impeachment of Patrick. At Carriger's trial, it was shown that the informant was a career burglar with six previous felonies, *see id.* at 480, whereas here, Patrick was impeached with only three previous convictions.

In holding that the suppressed evidence was material in *Carriger,* we stated that:

> The district court erred when it concluded that Carriger had not been prejudiced by the withholding of the information because the jury already knew [that the informant] was a burglar testifying with immunity. The telling evidence that remained undisclosed included the length of [the informant's] record . . . and, more important, his long history of lying to the police.

*Id.* at 481. Here, the defense was not informed of Patrick's burglary and obstruction of justice charges, his fraudulent attempt to smuggle guns into a prison, or his multiple thefts of drugs and money; nor was it informed of the fact that Patrick provided false information to law enforcement. As a result, the jury was not told about Patrick's record of criminal miscon-

duct while acting as an informant, nor that he had repeatedly lied to the police.

The present case is also similar to *United States v. Brumel–Alvarez*, 991 F.2d 1452 (9th Cir.1992), in which the government's principal witness was a police informant who had been involved in illegal drug operations for twenty-five years. The government withheld a memorandum that detailed false claims that the police informant had made to government agents. *Id.* at 1459. We stated that the informant's credibility "was an important issue in the case" and that "[e]vidence that he lied during the investigation ... would be relevant to his credibility and the jury was entitled to know of it." *Id.* at 1463; *see also United States v. Bernal–Obeso*, 989 F.2d 331, 335 (9th Cir.1993) ("[A] lie to the authorities paying for [an informant's] services ... would be relevant evidence as to the informant's credibility.").

Evidence that Patrick continually used drugs while acting as an informant and that the police knew about this but chose not to prosecute him would also be relevant to show his bias. If Patrick was continually receiving a benefit from the prosecution—the ability to use drugs without fear of criminal repercussions—that would have given him a motive to provide the prosecution with inculpatory information, even if he had to fabricate it.

Finally, evidence that Patrick was using drugs during the trial would reflect on his competence and credibility as a witness. There was no evidence at trial to impeach Patrick's competence or his ability to recollect or perceive the events. Thus, evidence of his drug use would have provided the defense with a new and different ground of impeachment.

Were there no other pieces of withheld evidence in this case, we would hold that the suppression of impeachment evidence about Patrick's criminal misconduct and repeated lies to the police, while acting as an informant, is, standing alone, sufficiently prejudicial to establish a *Brady* violation. The fact that other impeachment evidence was introduced by the defense does not affect our conclusion. Where, as here, there is reason to believe that the jury relied on a witness's testimony to reach its verdict despite the introduction of impeachment evidence at trial, and there is a reasonable probability that the suppressed impeachment evidence, when considered together with the disclosed impeachment evidence, would have affected the jury's assessment of the witness's credibility, the suppressed impeachment evidence is prejudicial. We need not further address the prejudice issue at this point, however, given our holding that the withheld impeachment evidence, when analyzed collectively, materially undermines our confidence in the verdict. *See* discussion of prejudice *infra* Section IV.B.5.

### (2) *Patrick's false allegation about Benn*

There is one specific lie of Patrick's that, standing alone, would be sufficient to constitute a *Brady* violation. The prosecution failed to disclose that Patrick approached the police a week before trial claiming that he had a videotape showing that Benn was involved in a killing that was part of a notorious unsolved murder case (the Green River murders) unrelated to the Dethlefsen–Nelson killings. The prosecution also failed to disclose that Patrick was given $150 to produce the tape, that he never did so, and that the detectives concluded that he was lying about the tape's existence and about Benn's involvement in the other murders. This evidence could have been used to show that Patrick was willing to lie *about Benn* and even to accuse him falsely of *murder*, if doing so would result in even a minimal benefit to him. In *Bernal–Obeso*, 989 F.2d at 336, we described the difference between general evidence of un-

trustworthiness and specific evidence that a witness has lied as follows: "All the other evidence used by the defense to punch holes in [the informant's] credibility amounted only to circumstantial reasons why[the informant] might alter the truth to continue to feather his own nest. A lie would be direct proof of this concern, eliminating the need for inferences."

 The evidence regarding the non-existent videotape would have seriously impeached Patrick in a way that the evidence presented at trial could not, and even that the evidence of other lies could not. It provided direct proof that Patrick was willing to lie specifically about Benn's involvement in a murder and to accuse him falsely of a capital offense. Patrick, when confronted with his lies at the state habeas evidentiary hearing, confessed that "I would lie—I would always lie about me. I would always do that. I was a liar." The jury, however, never heard that Patrick had lied about anything. The evidence regarding Patrick's tale of the videotape was "direct proof" of his lack of credibility, and the failure to disclose his fabrication was prejudicial.

### (3) *Patrick's exposure to prosecution*

 The *Brady* rule requires prosecutors to disclose any benefits that are given to a government informant, including any lenient treatment. *See, e.g., Giglio,* 405 U.S. at 150, 92 S.Ct. 763 (failure to disclose promise of immunity). During Benn's trial, Patrick was stopped for a traffic offense and arrested because he had outstanding warrants. He called the prosecutor from jail and the prosecutor arranged for him to be released without being charged. This benefit was never disclosed to the defense. Also during Benn's trial, the Fife police department asked the prosecution to charge Patrick with burglary, but the prosecutor's office dismissed the charges. Once again, this

information was withheld from the defense. The prosecution also arranged to postpone the filing of a warrant that was supposed to issue because Patrick had violated his probation. The warrant was delayed for two weeks—until after the Benn trial ended. The government failed to inform defense counsel about this benefit as well.

We have explained the reason why information regarding prosecution-provided benefits constitutes *Brady* material. In *Singh v. Prunty,* 142 F.3d 1157 (9th Cir. 1998), we stated:

> Disclosure of an agreement to provide such benefits, as well as evidence of the benefits themselves, could have allowed the jury to reasonably conclude that [the informant] had a motive other than altruism for testifying on behalf of the State. Such a finding could have substantially impeached [the informant's] credibility as a witness.

*Id.* at 1162. Here, too, a jury could have reasonably concluded that Patrick had "a motive other than altruism."

The state contends that the information regarding benefits was cumulative and immaterial because the defense cross-examined Patrick about his immunity from arrest during the trial and about the reduced sentence he received in exchange for his testimony. The reduced sentence that Patrick received did not provide any significant benefit to him. With good time credits for his work in prison, Patrick would have served only an additional 35 days had he received the longer sentence originally sought by the prosecutors. In addition, the state effectively downplayed the importance of this benefit in closing arguments by stating, "[t]he reward that he got was that in a 6 to 12 month sentence, he got six months instead of nine months. Big reward."

 Moreover, as we pointed out earlier, the state cannot satisfy its *Brady*

obligation to disclose exculpatory and impeachment evidence "by making some evidence available and asserting that the rest would be cumulative. Rather, the state is obligated to disclose 'all material information casting a shadow on a government witness's credibility.'" *Carriger*, 132 F.3d at 481–82 (internal citations omitted). Here, the number and nature of the undisclosed benefits was such that they would have impeached Patrick more effectively than the evidence that he was immune from arrest during the trial. The undisclosed benefits that Patrick received added significantly to the benefits that were disclosed and certainly would have "cast a shadow" on Patrick's credibility. Thus, their suppression was material.

### (4) *Patrick's experience as an informant*

 At trial, Patrick denied that he had ever previously been an informant in a murder case, but in fact he had. The state argues that this undisclosed evidence about Patrick's history was not material; however, in *Shaffer*, 789 F.2d at 689, we stated that undisclosed evidence that an informant had previously participated in a heroin investigation was important impeachment evidence that could have been used to discredit the informant's trial testimony that he had not previously participated in that type of investigation. The circumstances in *Benn* are identical.

### (5) *Prejudice Resulting from the Suppression of the Impeachment Evidence, Considered Collectively*

 In determining whether the suppression of impeachment evidence is sufficiently prejudicial to rise to the level of a *Brady* violation, we analyze the totality of the undisclosed evidence "in the context of the entire record." *Agurs*, 427 U.S. at 112, 96 S.Ct. 2392; *see also Bagley*, 473 U.S. at 682, 105 S.Ct. 3375 (opinion of Blackmun, J.).[11]

11. While the good faith or bad faith of the state is irrelevant when material impeachment evidence has been withheld from the defense, *see Brady*, 373 U.S. at 87, 83 S.Ct. 1194, the Supreme Court applies a stricter standard of materiality—a standard of materiality that is more favorable to the defendant—when the prosecutor has knowingly relied on or condoned the use of perjured testimony, *see Bagley*, 473 U.S. at 680, 105 S.Ct. 3375 ("[T]he fact that testimony is perjured is considered material unless failure to disclose it would be harmless beyond a reasonable doubt."); *Agurs*, 427 U.S. at 103, 96 S.Ct. 2392 (holding that, under this "stricter" standard of materiality, a conviction "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury"); *see also United States v. Endicott*, 869 F.2d 452, 455 (9th Cir.1989) ("[I]f the prosecution knowingly uses perjured testimony, or if the prosecution knowingly fails to disclose that testimony used to convict a defendant was false, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury verdict."). The Court explained that a stricter standard of materiality is necessary in these cases because they involve "prosecutorial misconduct and, more importantly ....'a corruption of the truth-seeking function of the trial process.'" *Bagley*, 473 U.S. at 680, 105 S.Ct. 3375 (quoting *Agurs*, 427 U.S. at 104, 96 S.Ct. 2392); *see also Bernal–Obeso*, 989 F.2d at 337.

Here, there is evidence that the state lied to defense counsel when it "falsely claim[ed]" that Patrick was in a witness protection program. There is also evidence that the state knowingly allowed Patrick to commit perjury when it stood by and said nothing while Patrick perjured himself by stating that he did not use drugs while acting as an informant. Similarly, the prosecution said nothing when Patrick lied at trial about never having previously served as an informant in a murder case. There is also evidence of other prosecutorial misconduct that corrupted the truth-seeking function of the trial. For example, the prosecution blatantly violated state discovery rules by failing to disclose Patrick's identity to the defense until the day before

Because the withheld impeachment evidence would not simply have been cumulative of the impeachment evidence introduced at trial, but would have created substantial doubt as to Patrick's credibility, it is important to analyze the significance of Patrick's testimony to the prosecution's case. Patrick's testimony was critical because it directly contradicted Benn's evidence that he acted in self-defense and that he did not premeditate the killings. Moreover, it provided the only direct evidence of the aggravating factor of common scheme or plan. Patrick was the only witness to testify to the state's primary theory that Benn killed Dethlefsen and Nelson for threatening to reveal an arson-insurance-fraud scheme. He was also the only witness to suggest that Benn wanted to kill Dethlefsen because Dethlefsen changed his will so as to remove Benn as a beneficiary. Without those theories (and it is difficult to believe that the jury would have accepted the will theory), the only motive the prosecution suggested was that Benn was upset because he thought that Dethlefsen was harassing his ex-girlfriend—a motive that supported the defense's theory (that Benn became upset when he saw a note with his ex-girlfriend's phone number on it in Dethlefsen's house and a spontaneous argument ensued) as much as the prosecution's.

Moreover, Patrick's testimony that Benn attempted to hire someone to kill Hartman while in prison undercut Benn's defense, because the jury was more likely to believe that Benn was guilty of premeditating the murders of Dethlefsen and Nelson after

being told that he plotted to kill Hartman from prison.

The state's failure to disclose to the defense that Patrick was a potential witness prior to the day before trial exacerbated the harm that resulted from its failure to provide impeachment information about him, because the defense did not have sufficient time to investigate Patrick and prepare for cross-examination.

The dissenting justices in the Washington Supreme Court's state habeas case stated that the withheld information concerning Patrick was so significant that a new trial was required. *See In re Benn,* 952 P.2d at 155–56. The district court agreed with the Washington Supreme Court's dissent that "[t]he significance of Patrick's testimony cannot be over-stated." *Benn v. Wood,* 2000 WL 1031361, at *5 (W.D.Wash.2000). Both statements are correct.

■■■ Analyzed collectively, the withheld impeachment evidence reveals that Patrick, a critical witness for the state, was "completely unreliable, a liar for hire, [and] ready to perjure himself for whatever advantage he could squeeze out of the system." *Id.* We hold that the suppression of the impeachment evidence undermines confidence in the outcome of Benn's trial and was therefore prejudicial. We further hold that the Washington Supreme Court's decision to the contrary was clearly erroneous and constitutes an unreasonable application of clearly established Supreme Court law.

---

trial, even though the prosecution had recorded his statement over a year earlier; the prosecution did not even attempt to obtain information about Patrick's informant history despite a court order to do so; and the detective who prepared the March 30, 1988 report "selectively omit[ted]" information that the fire was accidental. *See* discussion *supra*

Section I.B.2. Consequently, a stricter standard of materiality applies to the *Brady* analysis. It is, however, unnecessary to apply that standard in this case because the prejudice resulting from the suppression of the impeachment evidence here was so great that it would satisfy any rational standard of materiality.

## C. THE PROSECUTION'S FAILURE TO DISCLOSE EXCULPATORY EVIDENCE THAT THE FIRE AT BENN'S TRAILER WAS ACCIDENTAL AND NOT THE RESULT OF ARSON IS SUFFICIENT, STANDING ALONE, TO CONSTITUTE A *BRADY* VIOLATION.

 The prosecution failed to disclose that Deputy Fire Marshal Ted Thompson and Electrical Inspector Walter Erickson both conclusively determined that the fire in Benn's trailer was accidental. The state did disclose its March 30, 1988 report stating on the basis of these experts' investigation that there was "no fault or failure" of the lead electrical wire and no evidence of tampering with the fuse panel. The report did not state that the deputy fire marshal and electrical inspector had concluded that arson was *not* the cause of the trailer fire; that the furnace was the same type that Erickson had in his own home; or that there had been a manufacturer's recall of this type of furnace because it tended to cause fires. Rather, the report suggested that Coleman furnaces did not cause fires.

The experts' conclusion that the fire was accidental, and the reasons therefor, was material evidence that could have served to rebut the arson-insurance-fraud theory that the prosecution offered to prove motive, premeditation, and the aggravating circumstance of common scheme or plan. We reject the Washington Supreme Court's conclusion that the cause of the fire was not critical to the prosecution's insurance fraud theory because, as the state trial court stated, the arson-insurance-fraud theory evidence was "the kind of evidence that the State must and needs to prove if it's going to prove the aggravating factor that is involved in this case.... Without it, the State doesn't have a case for aggravated murder. ..." The district court reiterated this point when it stated that evidence of the accidental nature of the fire, if presented to the jury, would have "gravely undercut[ ] the fear of police exposure" that the prosecution asserted led Benn to kill Dethlefsen and Nelson. *Benn v. Wood*, 2001 WL 1031361, at 3113 *3 (W.D.Wash.2000).[12] The prosecutor also stressed the importance of the arson-fraud-insurance theory to the jury. In his closing argument, he stated: "And aggravating circumstances exist ... the common scheme or plan, the single act .... [H]e indeed wanted both men dead. He told the persons he confided in about the fact that Mike was threatening over the fire insurance money as well as Jack." [13]

 The state argues that its failure to disclose this exculpatory information did

---

12. The state points out that Benn did tell his brother, Monte, that he was nervous about fire insurance fraud charges being filed against him because he claimed a greater financial loss than he incurred. However, as the district court observed, a threat to tell the police that a person claimed more than he should have after a fire is materially different from a threat to tell the police that the person conspired to commit an arson, played a role in starting the fire, and then claimed an excessive loss following the fire. *See Benn v. Wood*, 2001 WL 1031361, at *3 (W.D.Wash. 2000).

13. At oral argument, the state contended that the mere fact that Benn shot both Dethlefsen and Nelson was sufficient to show a common scheme or plan and that the arson-insurance-fraud theory was, therefore, unnecessary. In order to prove a "common scheme or plan" under Washington state law, however, "there must be a nexus between the killings" that goes beyond the mere firing of the fatal shots. *Washington v. Finch*, 137 Wash.2d 792, 975 P.2d 967, 994 (1999). Specifically, "[t]he term [common plan or scheme] refers to a larger criminal design, of which the charged crime is only part. To prove the existence of this aggravator the killings must be connected by a larger criminal plan. Thus, the 'nexus' exists when an overarching criminal plan connects both murders." *Id.* The arson-insurance-fraud scheme was what the state relied on to prove "an overarching criminal plan."

not constitute a *Brady* violation because Benn was aware of the February 12, 1988 report in which the deputy fire marshal tentatively concluded that the fire was accidental. The February report's tentative conclusion, however, was displaced by the conclusions in the later March 30, 1988 report. The March report suggested that, after further investigation, the experts had reached a different conclusion. Specifically, the report stated that Al Pearson, a furnace technician, said that "he could find and think of no situation in which a furnace [such as a Coleman] had caused a fire in a mobile home."

 The state, relying on *United States v. Marashi,* 913 F.2d 724 (9th Cir. 1990), and *United States v. Aichele,* 941 F.2d 761, 764 (9th Cir.1991), asserts that there was no *Brady* violation because Benn could have discovered the experts' conclusions by interviewing them. *Marashi* does not support the state's position. There, we simply held that the prosecution's failure to disclose an IRS agent's notes revealing the identity of a private detective was not prejudicial to the defense because the defendant's own conduct showed that the evidence was not material. We relied in part on the fact that the defendant had access to and chose not to interview the individual who hired the private detective as support for that holding. *Marashi,* 913 F.2d at 733–34. Here, contrary to *Marashi,* there is no doubt of the materiality of the suppressed evidence.

*Aichele* involved the obligation of a United States Attorney to turn over California State Department of Corrections files that were under the exclusive control of California officials. We held that because the United States Attorney had no control over the state's files there was no *Brady* violation. *See also United States v. Santiago,* 46 F.3d 885, 894 (9th Cir.1995) (holding that the federal government did have an obligation to turn over information in the possession of the Bureau of Prisons and limiting the principle in *Aichele* to federal prosecutions in which material is held exclusively by a *state* agency). The *Aichele* court then added, by way of dictum, that if a defendant can ascertain the material on his own, there is no suppression. Certainly, that observation is overbroad, at the very least. We need not consider, however, whether the dictum in *Aichele* accurately states the law, particularly after *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), or what the limitations on that dictum might be. For whatever its merit, and we express no view, the *Aichele* dictum would not apply in circumstances such as those present here.

In *Paradis v. Arave,* 130 F.3d 385 (9th Cir.1997), a post-*Aichele* case, our *Brady* analysis was not affected by the defendant's knowledge of and ability to interview the prosecution's expert and obtain the undisclosed material. There, the medical expert testified at trial that the victim was killed in a creek where her body was found. That testimony contradicted the defense theory that the victim was killed by others at Paradis' house when Paradis was not home and that Paradis then just helped dump the body in the creek. After the trial, defense counsel discovered that the prosecutor had written notes of the briefing conducted by the medical expert shortly after he performed the autopsy. The written notes showed that at that time the medical expert had expressed the opinion that the victim did *not* die in the creek. The prosecution did not disclose this fact. We held that the undisclosed material constituted impeachment evidence, although the defendant obviously knew of the expert's existence and could have obtained the suppressed information from him. *Paradis,* 130 F.3d at 392.

 The facts in *Benn* are similar. Benn, like Paradis, knew of the experts' existence but had been supplied with evidence by the state that the experts' view supported the state's theory. A defendant furnished with such inculpatory evidence by the state is not required to assume that the state has concealed material information and has thereby obligated him to ascertain the *Brady* material on his own. In the case before us, moreover, the state not only failed to disclose the crucial information about the accidental nature of the fire, but it actually misled the defense by disclosing a part of the experts' findings that, read alone, would lead to a conclusion directly opposite to the one they reached.

 Evidence that the fire in Benn's trailer was *not* caused by arson and had been determined by fire officials to be accidental would have substantially undermined the state's principal theory of motive and its main support for the aggravating factor of common scheme or plan, as well as its contention that the killings were premeditated. Thus, we hold that the state's failure to disclose exculpatory evidence about the nature of the fire constitutes a *Brady* violation, independent of the *Brady* violation that resulted from the state's suppression of impeachment evidence. We also hold that the state court ruling regarding the exculpatory evidence was clearly erroneous and thus constituted an "unreasonable application" of clearly established Supreme Court precedent.

## V. CONCLUSION

In *Bernal–Obeso*, we stated that "we expect prosecutors and investigators to take all reasonable measures to safeguard the system against treachery. This responsibility includes the duty as required by *Giglio* to turn over to the defense in discovery all material information casting a shadow on a government witness's credibility." 989 F.2d at 334. Here, the state failed to take *any* measures to safeguard the system against treachery. To the contrary, the state suppressed material exculpatory and impeachment evidence that would have destroyed the credibility of its principal witness, severely undermined its theory of motive, and left it without substantial evidence of premeditation or an aggravating circumstance.

Because the suppressed impeachment evidence and the suppressed exculpatory evidence are each, standing alone, sufficiently prejudicial to merit relief under *Brady*, they *a fortiori* are sufficiently prejudicial when analyzed together. Given the importance of both Patrick's testimony and the arson-insurance-fraud theory to the prosecution's case, as well as the sheer volume and damaging nature of the improperly withheld evidence, we conclude that the Washington Supreme Court's determination that there was no *Brady* violation was clearly erroneous and constitutes an unreasonable application of Supreme Court precedent. To say that we have a firm conviction that the state court erred in its application of *Brady* and its progeny would be a gross understatement indeed. Because our holding of a *Brady* violation necessarily comprehends a holding that the *Brecht* prejudice standard is met, we hold that Benn is entitled to habeas relief. We affirm the district court's decision granting Benn's petition for a writ of habeas corpus.

**AFFIRMED.**

TROTT, Circuit Judge, Concurring:

Lord Acton, the celebrated 19th century British historian and student of politics, formulated an observation about government and human nature that aptly, and regrettably, fits this case: "Power tends to corrupt, and absolute power corrupts absolutely." It was for this reason that over one hundred years earlier, the Framers of

our Constitution meticulously separated the powers given by the People to our government and erected against each a structural series of checks and balances designed to confront the potential for abuse. Then, by enacting the Bill of Rights, the Framers made certain that basic principles of a fair and just trial could not be episodically overridden, even by a unanimous legislature, an overzealous executive, or a wayward judiciary.

In large measure, the Framers were influenced by Charles de Secondat, baron de Montesquieu, an astute student of history and politics in his own right, who, in his seminal work *The Spirit of the Laws,* said:

> Democratic and aristocratic states are not in their own nature free. Political liberty is to be found only in moderate governments; and even in these it is not always found. It is there only when there is no abuse of power: but constant experience shows us that every man invested with power is apt to abuse it, and to carry his authority as far as it will go. Is it not strange, though true, to say that virtue itself has need of limits?

> To prevent this abuse, it is necessary, from the very nature of things, power should be a check to power.

This case provides us with a textbook example of the abuse of executive power contemplated by Montesquieu, Lord Acton, and the Framers of our Constitution. Rather than adhere to the clear letter of the law, which itself is the ultimate check against arrogation of power, the prosecutor apparently deliberately withheld from the trial court and from the jury admissible evidence that would cause any fairminded person to have grave reservations about the credibility of a key government witness. The State's transgressions are well identified in dissent by Justice Johnson of the Supreme Court of Washington:

> The State withheld information from Benn's attorneys prior to and during his trial that the State was under direct court order to produce. The State violated the trial court's discovery order by failing to promptly provide a taped statement and documents received from Patrick regarding Benn's case. The State also violated a direct court order to produce information specific to Patrick's previous dealings with law enforcement officers.

> Testimony from the reference hearing also shows the State failed to list Patrick as a State witness until the eve of trial and prevented Benn's attorneys from interviewing Patrick until the day before trial by erroneously claiming Patrick was involved in a witness protection program. The State's misconduct deprived Benn of his Sixth Amendment right to fully cross-examine Patrick.

*In re Benn,* 134 Wash.2d 868, 952 P.2d 116, 153 (1998) (Johnson, J., dissenting).

The law and the truth-seeking mission of our criminal justice system, which promise and demand a fair trial whatever the charge, are utterly undermined by such prosecutorial duplicity. Although our Constitution guarantees to a person whose liberty has been placed in jeopardy by the State the right to confront witnesses in order to test their credibility, that right was willfully impaired in this case. By unlawfully withholding patently damaging and damning impeachment evidence, the prosecutor knowingly and willfully prevented Benn from confronting a key witness against him. Such reprehensible conduct shames our judicial system.

Prosecutors routinely take an oath of office when they become stewards of the executive power of government. That oath uniformly includes a promise at all times to support and defend the Constitution of the United States. Fortunately, the great majority of all prosecutors appreciate the solemnity of this oath. However, if a prosecutor fails to abide by this

undertaking, it is the duty of the judiciary emphatically to say so. Otherwise, that oath becomes a meaningless ritual without substance.

To his credit, Washington's Attorney General does not defend the prosecutor's indefensible behavior, each aspect of which is accurately described in Judge Reinhardt's thorough opinion. In oral argument, counsel for the respondent readily conceded egregious wrongdoing, but argued nevertheless that on this record, the wrongdoing did not prejudice the petitioner. With all due deference to the Supreme Court of the State of Washington, I respectfully disagree, as do my colleagues, with the State's assessment of this issue. Thus, I join in Judge Reinhardt's explanation of our reasons and conclusions compelled here by the Constitution, and in my colleagues' decision in this case. Benn must be given that to which he is fully entitled and which he has not yet received: a fair trial.