**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. MANUEL YEPIZ, AKA Martin Sanchez, Seal G and Pony; *Defendant-Appellant.* | No. 07-50051 D.C. No. CR-05-00578-JFW-7 |
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. JOSE LUIS MEJIA, AKA Jose Luiz Mejia, Jose Nernedes, Juan Martinez, Jose Mejia, Check Mejia, Jose Al Mejia, Joe Morin, Jose L. Mejia, "Checho", "Joe" and "Cheech", *Defendant-Appellant.* | No. 07-50062 D.C. No. CR-05-00578-JFW-37 |

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee*,

v.

FRANCISCO ZAMBRANO, AKA
Franky Boy and "Franky",
          *Defendant-Appellant.*

No. 07-50063

D.C. No.
CR-05-00578-
JFW-35

---

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee*,

v.

JESUS CONTRERAS, AKA Jessie
Contreras, Yuck,
          *Defendant-Appellant.*

No. 07-50067

D.C. No.
CR-05-00578-
JFW-21

---

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee*,

v.

MARIANO MEZA,
          *Defendant-Appellant.*

No. 07-50070

D.C. No.
CR-05-00578-
JFW-44

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

SERGIO MEJIA, AKA Robert Mesa,
Seal JJ, Jaws,
*Defendant-Appellant.*

No. 07-50098

D.C. No.
CR-05-00578-
JFW-36

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

GILBERTO CARRASCO, AKA Gilberto
Carrasco, Jr., Gil Carrasco, Robert
Carrasco, Gilberto Carrosco,
Gilberto Corrosco, Julio Gonazalez,
Vicente Hernandez, Vincente
Hernandez, Vincente NMN
Hernandez, Sergio Renteria, Juan
Rosas, Beto, Betillo, Red and Cejas,
*Defendant-Appellant.*

No. 07-50133

D.C. No.
CR-05-00578-
JFW-22

| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. ERNESTO OROZCO MENDEZ, AKA "Gordo", "El Gordo", Ernesto Mijares, Ernesto Mendoza Mijares, Ernesto Mendoza Orozco (Birth Name), *Defendant-Appellant.* | No. 07-50142 D.C. No. CR-05-00578-JFW-31 |
|---|---|

| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. RAFAEL YEPIZ, *Defendant-Appellant.* | No. 07-50264 D.C. No. CR-05-00578-JFW-1 OPINION |
|---|---|

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted December 7, 2015
Pasadena, California

Filed December 20, 2016

Before: Stephen Reinhardt, John T. Noonan,
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Noonan;
Dissent by Judge Nguyen

## SUMMARY[*]

### Criminal Law

In appeals by nine defendants convicted of crimes arising out of their alleged membership or association with a Southern California gang, the panel remanded for fact-finding in connection with the defendants' joint *Brady* claims, vacated Manuel Yepiz's conviction due to defects in the district court's handling of his requests for substitution of counsel, and remanded for a new trial in Yepiz's case.

On the joint claim that the government violated *Brady v. Maryland* by failing to disclose the full extent of the benefits a cooperating witness received at trial, the panel rejected the government's arguments that the defendants waived this claim, that the allegedly withheld information would have been cumulative, and that the record conclusively shows that the benefits were all earned after the trial. In light of disputed facts surrounding the *Brady* claim, the panel remanded to the district court so that it may engage in the necessary fact-finding to ascertain whether the witness received benefits that were undisclosed to the defendants at

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the time at trial, and if so, whether *Brady* was violated as to each convicted count.

The panel held that the district court abused its discretion when it arbitrarily and without explanation rejected Manuel Yepiz's pro se April 9, 2006 letter seeking to replace his retained counsel with court-appointed counsel. The panel wrote that Yepiz's failure to submit his letter through the very counsel he was hoping to discharge does not negate the court's duty to inquire into the problems between Yepiz and counsel when they were first raised. The panel held that Yepiz did not waive his motion to substitute counsel by failing to reassert it at a May suppression hearing. The panel held that the record is sufficiently clear to determine, without remanding, that replacing counsel would not have caused significant delay or impeded the fair, efficient, and orderly administration of justice. The panel concluded that Yepiz was therefore entitled to discharge retained counsel "for any or no reason," and that if he still qualified as an indigent defendant at the time he sent his pro se letter requesting substitution, he was also statutorily entitled to appointed counsel under the Criminal Justice Act.

The panel addressed other issues in a concurrently filed memorandum disposition.

Judge Nguyen dissented in part. She wrote that the majority's holding that the district court's failure to consider Yepiz's letter is structural error requiring automatic reversal (1) invalidates well-established local rules prohibiting represented parties from communicating with the court pro se, and (2) by refusing to engage in harmless error analysis, brings this court seriously out of step with the Supreme Court's Sixth Amendment jurisprudence.

## COUNSEL

Verna Wefald (argued), Pasadena, California, for Defendant-Appellant Manuel Yepiz.

Phillip A. Treviño, Los Angeles, California, for Defendant-Appellant Jose Luis Mejia.

Shawn Perez, Las Vegas, Nevada, for Defendant-Appellant Francisco Zambrano.

Phillip Deitch, Santa Monica, California, for Defendant-Appellant Jesus Contreras.

Donald C. Randolph (argued) and Ann-Marissa Cook, Randolph & Associates, Santa Monica, California, for Defendant-Appellant Mariano Meza.

Diane Berley, West Hills, California, for Defendant-Appellant Sergio Mejia.

Adam Axelrad, Los Angeles, California, for Defendant-Appellant Gilberto Carrasco.

Gary P. Burcham, Burcham & Zugman, San Diego, California, for Defendant-Appellant Ernesto Orozco Mendez.

Katherine Kimball Windsor (argued), Law Office of Katherine Kimball Windsor, Pasadena, California, for Defendant-Appellant Rafael Yepiz.

L. Ashley Aull (argued) and David Kowal, Assistant United States Attorneys; Robert E. Dugdale, Chief, Criminal

Division; United States Attorney's Office, Los Angeles, California; for Plaintiff-Appellee United States.

---

**OPINION**

NOONAN, Circuit Judge:

Appellants are all alleged to be members or associates of the Vineland Boys ("VBS"), a gang located in Southern California. On November 30, 2005, a grand jury returned a 78-count first superseding indictment charging appellants and approximately forty other individuals with crimes arising out of their membership or association with VBS. Seven of the nine appellants were charged with violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and with RICO conspiracy (Counts 1 and 2, respectively), and all appellants were charged with distribution of narcotics (Count 3). Other charged counts included violent crimes in aid of racketeering ("VICAR"), attempted murder, and possession with intent to distribute cocaine, methamphetamine, and marijuana.

Trial commenced on August 9, 2006. On October 26, 2008, the jury returned a verdict of not guilty as to five counts, a mistrial as to one count, and a verdict of guilty as to the remaining counts. Appellants' subsequent motions for judgments of acquittal and new trials were denied by the district court. Appellants—Manuel Yepiz, Jose Luis Mejia, Francisco Zambrano, Jesus Contreras, Mariano Meza, Sergio Mejia, Gilberto Carrasco, Rafael Yepiz, and Ernesto Mendez—timely appealed their convictions and sentences.

We note at the outset that this case was vigorously litigated over the course of two-and-a-half months. It

presented the district court with a gauntlet of complex legal questions, and required it to grapple with unique concerns to courtroom safety and logistics. We are now presented with nearly three dozen distinct legal questions on appeal. These questions have been met by the district court promptly and persuasively.

In this opinion we resolve (1) appellants' joint *Brady* claims, and (2) Manuel Yepiz's Sixth Amendment Right to Counsel claim.  We address the remaining issues in a concurrently filed memorandum disposition.

## I. DEFENDANTS' JOINT BRADY CLAIMS

### BACKGROUND

At trial, one of the government's cooperating witnesses was Victor Bulgarian. In September of 2006, on direct examination, Bulgarian testified that he was previously arrested for possession and sale of methamphetamine in an unrelated case, and agreed to cooperate with law enforcement in exchange for a lesser sentence, and a grant of immunity for his testimony as a government witness. Bulgarian testified to having received no benefits from the government in exchange for his testimony.  However, on cross-examination, Bulgarian testified to having received $5,000 in cash from the government after he testified to the grand jury in this case.  Defendants noted that this testimony directly contravened a letter the government sent to them asserting that no witnesses received any benefits from the government in exchange for their testimony.  The government acknowledged that it was "a glaring mistake," but argued that the error was cured because defendants had ample opportunity to cross examine Bulgarian on the subject of the $5,000 payment. Defendants did not raise the issue again either at trial or in a post-trial motion.

Approximately three years later, on August 20, 2009, Bulgarian testified in the trial of Horacio Yepiz.[1] On direct examination, Bulgarian once again testified to having received no benefit from the government in return for his testimony. On cross examination, Bulgarian testified that since his arrest for drug-related crimes in 2004, he had received roughly $100,000 to $200,000 in cash from five different law enforcement agencies, although he was unable to give an exact figure. He explained that he was able to solicit paid work from these agencies whenever he wanted ("I decide when I want to work, and when I work, I get paid."). Indeed, he testified to having received $800 for three hours of work the week prior. Appellants now argue that the government violated *Brady* by failing to disclose the full extent of the benefits Bulgarian received at trial.

## STANDARD OF REVIEW

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). To prevail on a *Brady* claim, the defendant must show that the evidence was material. Materiality is satisfied when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). This Court reviews alleged *Brady* violations de novo. *United States v. Baker*, 658 F.3d 1050, 1053 (9th Cir.

---

[1] Horacio Yepiz was originally joined as a co-defendant of appellants, but was later deemed incompetent and tried separately.

2011), *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012).

## DISCUSSION

The government makes three arguments in support of its contention that it did not violate *Brady*: (1) defendants waived any *Brady* claim by failing to raise it at trial; (2) the allegedly withheld information would have been cumulative in light of other impeachment material provided to defendants; and (3) the record demonstrates that Bulgarian received these payments only after the trial in this case.

The government argues that defendants have waived their *Brady* claim by failing to raise it in the trial court. However, this Court has previously rejected this precise argument. In *United States v. Bracy*, undisclosed impeachment evidence of a government witness was uncovered for the first time in a later trial of a severed group of defendants. 67 F.3d 1421, 1428 (9th Cir. 1995). The information came to light only after the defendant had filed his notice of appeal, thereby divesting the trial court of jurisdiction over his case. *See generally Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982). This Court concluded that "[i]t defies logic to suggest that [the defendant] waived a claim by not raising it before a court that lacked jurisdiction to consider it." *Bracy*, 67 F.3d at 1428. This reasoning applies with equal force here given that defendants appealed their case in early 2007, roughly two-and-a-half years before the new evidence was revealed.

Next, the government presents a litany of impeachment evidence that it produced to defendants, and argues that "additional payments information could hardly have caused the jury to view Bulgarian or his relationship with the government differently or with greater caution." To the

extent that the government argues that its duties under *Brady* only encompass disclosure of non-cumulative evidence, this Court has previously found this line of reasoning unavailing. *Carriger v. Stewart*, 132 F.3d 463, 481 (9th Cir. 1997) ("We have held that the government cannot satisfy its *Brady* obligation to disclose exculpatory evidence by making some evidence available and claiming the rest would be cumulative.") (internal citations omitted).  Moreover, failure to produce evidence (1) that Bulgarian made hundreds of thousands of dollars assisting law enforcement, and (2) enjoyed a relationship that allowed him to earn benefits whenever he chose, was material despite the effect of other impeachment evidence provided by the government.  Indeed this evidence could very well have resulted in the jury disbelieving all of Bulgarian's testimony, which played an important role in the government's case.  *Cf. Benn v. Lambert*, 283 F.3d 1040, 1058 (9th Cir. 2002) ("The undisclosed benefits that Patrick received added significantly to the benefits that were disclosed and certainly would have 'cast a shadow' on Patrick's credibility.  Thus, their suppression was material.").

The government's attempts to minimize the significance of Bulgarian's testimony are not persuasive in light of the record.  While some of Bulgarian's testimony was independently corroborated, it nonetheless played a substantial role in the government's case-in-chief. In particular, Bulgarian's testimony was relied upon heavily by the government to show that VBS was a "criminal enterprise" under RICO.  Therefore, had the alleged *Brady* materials been made available to appellants at trial, there is a "reasonable probability" that the result of the proceeding would have been altered.

Finally, the government argues that the record conclusively shows that the benefits Bulgarian testified to receiving were all earned *after* appellants' trial, and therefore could not serve as the basis of a *Brady* violation. The government points to a discovery letter sent to Horacio Yepiz in August of 2009, informing him that since Bulgarian's testimony in this case in 2006, he had received an additional $80,000 to $90,000 from the government. However, Bulgarian testified that he may have received as much as $200,000 between 2004 and 2009; therefore a letter stating that he received roughly half that sum after appellants' trial in 2006 does not foreclose appellants' *Brady* claim.

The government concedes that the facts surrounding benefits paid to Bulgarian are "in dispute." Likewise, defendants admit that "there are fact-finding gaps in the record with regard to how much Bulgarian was paid, when he received payments, and the purpose of the payments." Defendants attempt to bridge these "gaps" by requesting that the court simply take judicial notice of Bulgarian's 2009 testimony at the trial of Horacio Yepiz. However courts may only take judicial notice of facts "not subject to reasonable dispute;" therefore the court **DENIES** defendants' motion. Fed. R. Evid. 201; *see also Lee v. City of L.A.*, 250 F.3d 668, 690 (9th Cir. 2001).[2]

---

[2] Defendants also request that this court take judicial notice of a complaint, verdict, and judgment in a state civil negligence case. Defendants have failed to adequately explain how these documents relate to any of their arguments on appeal, and how they meet the standard for judicial notice. MJN at 5 (citing JOB at 76–77). The Court therefore

In light of the disputed facts surrounding defendants'
*Brady* claim, we **REMAND** to the district court so that it
may engage in the necessary fact-finding to ascertain
whether Bulgarian received benefits that were undisclosed
to appellants at the time of trial, and if so, whether *Brady*
was violated as to each convicted count.[3]

## II.  MANUEL YEPIZ'S SUBSTITUTION OF COUNSEL CLAIM

### BACKGROUND

Following Manuel Yepiz's ("Yepiz") arrest in June
2005, an attorney named Bernard Rosen was appointed to
represent him.  In November 2005, Yepiz retained Nicolas
Estrada to replace Rosen.  On April 9, 2006, Yepiz wrote a
letter addressed "to the Honorable Judge Walters," which the
court received on April 11, 2006.  In the letter, Yepiz
expressed "great concern" about "financial differences" he
was having with Estrada.  He stated that Estrada had asked
him for $200,000 to proceed to trial, despite having told
Yepiz and his family he would only charge an additional
$25,000 to $35,000 for trial.  He stated that if Estrada "would

---

**DENIES** defendants' motion for judicial notice as to these documents as
well.

[3] At oral argument, the government conceded that defendants should
have an opportunity to litigate their *Brady* claims by collaterally
attacking their conviction under 28 U.S.C. § 2255.  However, the
government points to no opinion of this Court holding that a post-
conviction motion under § 2255 is preferable to a remand.  Indeed, the
government stated at oral argument that "it doesn't make much
difference" what mechanism is used.  Moreover, defendants would not
enjoy the benefit of counsel in a § 2255 proceeding.  Given that counsel
for defendants are already familiar with the facts surrounding the *Brady*
issue, the interests of justice and judicial efficiency militate in favor of
remanding to the district court.

have been more truthful from the start, [he] would have never hired [Estrada]," because his family could not afford him. Finally, Yepiz noted that he did not want to "waste everybodys [sic] time by waiting [until] the last minute to ask for a new attorney," that he had only recently been informed of Estrada's prices, and that he was thus requesting a "panel attorney" now, so that he or she could "prepare for trial and [have] everything [go] as schedule[d]."

The court did not accept Yepiz's letter, and instead ordered the letter "returned to counsel" along with a Notice of Document Discrepancies (NDD). A checked box at the bottom of the NDD stated that Yepiz's letter was "**NOT** to be filed, but instead **REJECTED**." The NDD did not indicate the basis for the court's rejection, and the docket description of the document only indicated that the denial was based on the fact that "[p]arties should not write letter[s] to Judge." Yepiz and Estrada subsequently appeared before the court on May 9, 2006 for a hearing on a motion to suppress evidence, though neither Yepiz nor Estrada reasserted Yepiz's motion for substitution of counsel.

On July 25 and 31, Yepiz wrote two additional letters addressed to Judge Walter asking for an "in camera hearing" to "request the Court to appoint new counsel" on his behalf. He raised several concerns in his letters regarding Estrada's representation, and the court scheduled a hearing for August 4, 2006 to address them. At the hearing, the court stated that it had received "two letters from the defendant," referring to those letters dated July 25 and July 31. It did not reference Yepiz's April 9 letter. After discussing several of Yepiz's concerns, the following exchange took place between Yepiz and Judge Walter:

> **Yepiz**: Okay, Your Honor. And then another thing. I addressed the Court—I wrote this

letter on April 9th—yes, I believe April 9th. I have it right here.  It was returned, it was signed by, I believe, you and returned.**[4]** Right here I'm asking for a lawyer because I'm already having problems with [Estrada] as of April 9th.  This is not something that happened last week or a few weeks ago, [Y]our Honor, this has been going on. . . . This is a whole letter right here signed by you, yourself, [Y]our Honor, I have it right here in front of me.

**The Court**:  Well, I didn't sign any letter.

**Yepiz**:  Well, it's right here.

**The Court**:  I didn't sign your letter.

**Yepiz**:  You didn't sign—oh, you signed the copy of it.

**The Court**:  Your letter that you're saying that I signed.

**Yepiz**:  My letter, I apologize, you know, I'm not the brightest car in the lot.

**The Court**: All right.  Anything else?

---

**[4]** While the NDD stipulated that the letter should be returned to counsel, based on Yepiz's statements, he was aware that the letter had been returned, either because it had been returned directly to him, or because Estrada informed him that it had been returned.

The court then briefly questioned Yepiz about his July 25 letter, but never again acknowledged Yepiz's April 9 letter. The court held that "the issues raised ha[d] been adequately addressed by counsel" and that Yepiz's requests for substitution were "untimely, as [they had been] filed on the eve of trial." The court further stated that because it had received four or five letters from several of Yepiz's co-defendants who were "all housed together at [a correctional facility]," they amounted to "nothing more than a strategic attempt to delay the trial." Because it found that a substitution "would necessitate a continuance" of the trial, the court denied Yepiz's request.

On September 20, 2006—the 23rd day of trial—Yepiz sent a fourth letter to the court that was addressed to Judge Walter. The letter raised several "concerns as to [Yepiz's] attorney and his representation." Among other things, it stated that Estrada would not spend $60 to copy a videotape of Yepiz's arrest and that he feared Estrada had "lost interest to defend [him]" because he had "run out of money." He stated that Estrada was "constantly harass[ing]" him for money and his family was "selling their house to pay him," but that Estrada's response was "no money [no] defense." Interpreting Yepiz's letter as a request for substitution of counsel, the court scheduled a hearing for three days later, where Yepiz clarified that the letter was actually "just a request to get the video" from Estrada, and Estrada agreed to produce it.

## STANDARD OF REVIEW

"We review a district court's denial of a motion for substitution of counsel for abuse of discretion." *United States v. Rivera-Corona*, 618 F.3d 976, 978 (9th Cir. 2010). Unlike "most substitution cases" that "arise when an indigent defendant requests new court-appointed counsel in

place of an existing appointed attorney," the present appeal concerns a defendant's request to replace retained counsel with appointed counsel. *Id.*

The Sixth Amendment provides that, [i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right "encompasses two distinct rights: a right to adequate representation" for all defendants and, for defendants who have retained their own attorney, the right "to be represented by the attorney of [their] choice." *Rivera-Corona*, 618 F.3d at 979 (emphasis omitted). The right to counsel of choice includes the constitutional "right to discharge retained counsel," and a defendant may generally do so "for any reason or no reason" so long as "the substitution would [not] cause significant delay or inefficiency or run afoul of . . . other considerations," such as the "fair, efficient and orderly administration of justice." *United States v. Brown*, 785 F.3d 1337, 1340, 1344, 1345, 1346 (2015); *Rivera-Corona*, 618 F.3d at 980–81. "[D]enial of a defendant's right to counsel of choice is a structural error, requiring that convictions be vacated even without a showing of prejudice." *Brown*, 785 F.3d at 1350. Where a "court allows a defendant to discharge his retained counsel and the defendant is financially qualified, the court must appoint new counsel for him under the Criminal Justice Act" (CJA), at any stage of the proceedings. *Id*. at 1340; 18 U.S.C. § 3006A.

## DISCUSSION

Yepiz claims the district court abused its discretion when it failed to inquire into his April letter seeking to replace Estrada with court-appointed counsel. We agree. Under this court's precedent, "the trial judge had a duty to inquire into the problems between" Yepiz and Estrada "when they were

first raised." *Blacketter*, 525 F.3d at 896. The court here failed to conduct any inquiry with regard to Yepiz's April letter, though it clearly understood it was bound by such a duty given the speed with which it scheduled hearings regarding Yepiz's July and September letters, each of which were similarly addressed directly to Judge Walter. Yepiz's failure to submit his letter through the very counsel he was hoping to discharge, does not negate the court's duty.

As an initial matter, the government argues that the court need not have addressed Yepiz's request because it was not properly filed. According to the government, Yepiz's letter was rejected and not filed because it did not comply with Local Rules 83-2.9.1 and 83-2.11. Those rules prohibit parties who are represented by counsel from acting *pro se* and from communicating with the judge via letters or phone calls. *See* C.D. Cal. Civ. L-R 83-2.9.1 & 83-2.11. The NDD rejecting Yepiz's letter, however, made no mention of these local rules. Indeed, no reason for the rejection was provided on that form. It was only on the electronic version of the docket that any explanation was provided: "[p]arties should not write letter [sic] to Judge." Thus, no clear explanation as to why Yepiz's letter was rejected was ever presented to Yepiz's counsel, and because the letter and NDD were sent to Yepiz's counsel and not to Yepiz, Yepiz was given no explanation at all.

Had such an explanation been given to Yepiz, he would have been in a position to properly comply with the local rules: he could have requested that his counsel file a motion asking to withdraw, a motion which his counsel would have been ethically obligated to file. Alternatively, Yepiz could have filed another letter explaining why he was unable to comply with the rules—perhaps his counsel was unwilling or unable to comply with his ethical obligations to file a

motion to withdraw, or perhaps Yepiz was unable to contact his counsel at all. Because no explanation was provided, Yepiz was not given notice as to how he could properly present his request for new counsel, and as such, the local rules served to arbitrarily deny Yepiz's constitutional rights. Under the circumstances of this case, therefore, we reject the government's argument that the court was excused from its duty to inquire into Yepiz's request because of Yepiz's failure to comply with any local rule of procedure.

The government also argues that Yepiz waived his Sixth Amendment right to counsel when he failed to reassert his substitution motion at the May suppression hearing. *See United States v. Taglia*, 922 F.2d 413, 416 (7th Cir. 1991) (stating that "[i]f a motion is not acted upon, a litigant had better renew it. He may not lull the judge into thinking that it has been abandoned and then, after he has lost, pull a rabbit out of his pocket in the form of the forgotten motion."). However, the record does not support the government's claim of waiver.

A constitutional right may generally only be waived "if it can be established by clear and convincing evidence that the waiver is voluntary, knowing, and intelligent," and we must "indulge every reasonable presumption against waiver of fundamental constitutional rights." *Schell v. Witek*, F.3d 1017, 1024 (9th Cir. 2000). In *Schell*, we held that the defendant did not voluntarily, knowingly, and intelligently waive his right to counsel when he failed to reassert a request for substitution that the court had overlooked. *Id.* Instead, we found that because Schell's attorney had advised him that his motion "must have been denied" and there was "nothing in the record to suggest that Schell knew of the court's inadvertent error," he could not have waived the request. *Id.* While this case presents a slightly different scenario in that

we do not know why Yepiz failed to reassert his motion at the May hearing, our conclusion is the same.

In this case, Yepiz sent his first letter to the court in April 2006, which the court rejected. He then sent two additional letters addressed to Judge Walter requesting substitution of counsel in July 2006. At a hearing to address the July letters, Yepiz stated that the issues he was having with Estrada were "not something that had just happened last week," but had instead "been going on" since April. In his September letter, Yepiz stated that "[d]uring a conversation in April 2006, I explained I had no more money . . . [and] [w]e agreed that [Estrada] would withdraw from the case. However, he still remains and I am being repeatedly harassed for money." Yepiz's consistent statements that his issues with Estrada had not been resolved suggest that Yepiz did not voluntarily, knowingly, or intentionally waive his motion.

This conclusion is supported by the fact that the NDD failed to put Yepiz on notice that the letter was rejected or how he might rectify the deficiency. For all he knew, as in *Schell*, the motion "must have been denied." *Schell*, 218 F.3d at 1024. We therefore hold that Yepiz did not waive his motion.

While it may sometimes be necessary to remand a case such as this to the district court in order to determine whether substitution of counsel would have "caused significant delay" or impeded the "fair, efficient and orderly administration of justice," the record here is sufficiently clear to determine, without remanding, that replacing Estrada would not have implicated these concerns. *Blacketter*, 525 F.3d at 896. The court received Yepiz's April 2006 letter four months prior to the start of trial. In the letter, Yepiz stated specifically that he "did not want to delay the trial," and merely wanted to "have the time to get a new

lawyer to defend [him] properly," as provided by the Constitution. *Id.* The district court later suggested that "five weeks would have been sufficient time" for a substitute attorney to prepare a defense for a different defendant joined in Yepiz's case, and any counsel appointed to represent Yepiz would have had months to prepare for trial. Because the substitution would not have affected the court's calendar, Yepiz was entitled to discharge Estrada "for any reason or no reason." *Blacketter*, 525 F.3d at 896. If Yepiz still qualified as an indigent defendant at the time he sent his April letter, he was also statutorily entitled to appointed counsel under the CJA. *Brown*, 785 F.3d at 1346.

We therefore find that the district court abused its discretion when it arbitrarily and without explanation rejected Yepiz's April 2006 letter. Given the defects in the district court's handling of Yepiz's requests, we **VACATE** Yepiz's conviction and **REMAND** for a new trial. *Brown*, 785 F.3d at 1350.

---

NGUYEN, Circuit Judge, dissenting in part:

While represented by competent retained counsel, Manuel Yepiz sent a pro se letter to the district court. Because the court's local rules prohibit, among other things, represented parties from communicating with the court pro se, his letter was not filed. Instead, the court returned the letter to Yepiz's counsel along with notice of the reason for the rejection. Importantly, Yepiz's letter doesn't suggest any dissatisfaction with his attorney's representation, only with its cost. Yet the majority holds that the court's failure to consider the letter is structural error requiring automatic reversal of Yepiz's conviction. I respectfully dissent.

The majority's ruling invalidates not only well-established local rules in the Central District of California, but similar rules in every district in the Ninth Circuit. More troubling, however, is the majority's refusal to engage in harmless error analysis. A request for appointed counsel implicates the Sixth Amendment's guarantee of effective assistance, not choice, of counsel, regardless of whether the attorney whom the criminal defendant seeks to replace was retained or appointed. Consistent with other effective-assistance cases, Yepiz's conviction should be affirmed unless he can show prejudice. There was no such showing here. Indeed, counsel continued to represent Yepiz competently throughout the extensive proceedings in this case, including pretrial hearings, trial, and sentencing. By finding structural error and vacating the conviction, the majority brings us seriously out of step with the Supreme Court's Sixth Amendment jurisprudence.

## I.

I agree with the majority that the Sixth Amendment claim turns on Yepiz's April 2006 handwritten letter to the district court regarding his retained attorney, Nicolas Estrada.[1] In the letter, Yepiz did not express concern about Estrada's competence or any other aspect of his performance. To the contrary, the letter was premised

---

[1] Yepiz sent four letters to the court regarding Estrada. The first, at issue here, was sent in April 2006. Yepiz followed up with two more in July, and a fourth letter in September after trial had begun. I agree with the majority that the denial of the July and September requests for substitution of counsel were justified. *See, e.g.*, *United States v. Garcia*, 924 F.2d 925, 926 (9th Cir. 1991) ("We have consistently held that a district court has broad discretion to deny a motion for substitution made on the eve of trial if the substitution would require a continuance." (citing *United States v. McClendon*, 782 F.2d 785, 789 (9th Cir. 1986))).

entirely on "financial differences" that developed between Yepiz and Estrada. Yepiz wrote that he "need[ed] a Panel attorney" because Estrada had only recently informed him of the representation's "financial cost."

The court "rejected" the letter for filing and returned it to counsel for failure to comply with the district court's local rules. Those rules prohibit a party from "writing letters to . . . or otherwise communicating with a judge in a pending matter unless opposing counsel is present" and require "[a]ll matters [to] be called to a judge's attention by appropriate application or motion." C.D. Cal. L.R. 83-2.11 (2006). The rules also prohibit a represented party from acting pro se. C.D. Cal. L.R. 83-2.9.1 (2006). It appears that the letter may have been bounced by court staff without the judge's involvement.[2] At a later hearing in which Yepiz recounted the letter, the district judge gave no indication that he had seen it.

The district court sent a notice of discrepancy to Estrada informing him that filing was rejected, along with a copy of the letter. The electronic docket entry noted the reason for the rejection as "[p]arties should not write letter [*sic*] to

---

[2] Federal Rule of Civil Procedure 5(d)(4) prohibits the *clerk* from refusing to file a paper solely for noncompliance with a local rule, but such orders can be entered at the direction of a *judicial officer*. *E.g.*, *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1129 (9th Cir. 2002); *see* Fed. R. Civ. P. 5(e) advisory committee's note to 1991 amendment ("The enforcement of these rules and of the local rules is a role for a judicial officer."). It's unclear whether Judge Walter saw the letter and rejected the filing, he delegated that duty, or, if his usual practice was to set a hearing, a clerk inadvertently failed to comply. That Judge Walter's signature is on the notice of discrepancy doesn't definitively tell us the answer as most judges have signature stamps for their courtroom deputy's use.

judge." In short, the district court promptly alerted Estrada that the letter was not filed and gave him a copy of it so that he would know the exact nature of his client's complaint. It appears that Estrada discussed the matter with his client because, at a subsequent hearing, Yepiz stated that he had a copy of the "returned" letter "signed by" the court (presumably referring to the notice of discrepancy).

Yet for three months after filing was rejected, neither Yepiz nor defense counsel raised any concerns. Estrada continued to represent Yepiz, filing a reply in support of his motion to suppress wiretap evidence and appearing alongside him at the hearing. Throughout that time Estrada never filed a motion to withdraw or a request for substitution.

## II.

The majority acknowledges that the letter was neither filed nor considered on the merits. It concludes, however, that because the district court presented "no clear explanation as to why Yepiz's letter was rejected" to Yepiz or to this attorney, the local rules "served to arbitrarily deny Yepiz's constitutional rights." Slip Op. at 19–20. I disagree.

For one thing, the docket entry plainly states that the letter was rejected "based on: [p]arties should not write letter [*sic*] to judge." Estrada received this notice. *See* C.D. Cal. L.R. 5-4.1.4(4). Moreover, because "familiarity with [the] Local Rules [is] a prerequisite to admission to practice in the Central District," *Moore v. La Habra Relocations, Inc.*, 501 F. Supp. 2d 1278, 1279 (C.D. Cal. 2007) (citing C.D. Cal. L.R. 83-2.2.2 (2006)), Estrada was expected to know that those rules prohibited represented parties from writing letters directly to the judge. He certainly would have

known that the Federal Rules of Civil Procedure require motions to be served on opposing counsel. Fed. R. Civ. P. 5(a)(1)(D).

Once Estrada learned that his client might want to discharge him, he had a duty to promptly discuss the issue with Yepiz and, if Yepiz indeed had that intent, to honor it. An attorney has an ethical obligation to seek substitution or withdrawal if his client wants the representation to end. *See, e.g.*, *Fracasse v. Brent*, 6 Cal. 3d 784, 790 (1972) ("[T]he client's power to discharge an attorney, with or without cause, is absolute." (citation omitted)); *see also* Cal. Bus. & Prof. Code § 6068(m) (requiring attorneys "to keep clients reasonably informed of significant developments"); Cal. R. of Prof'l Conduct, R. 3-500 (same).

"[T]he attorney is in the best position to determine when a conflict exists and so 'defense attorneys have the obligation, upon discovering a conflict of interests, to advise the court at once of the problem.'" *United States v. Elliot*, 463 F.3d 858, 866 (9th Cir. 2006) (quoting *Holloway v. Arkansas*, 435 U.S. 475, 485–86 (1978)). Attorneys routinely bring their clients' requests to discharge counsel or potential conflicts to the court's attention, including in the cases relied upon by Yepiz and the majority. *E.g.*, *United States v. Brown*, 785 F.3d 1337, 1341–42 (9th Cir. 2015) ("[Defense counsel] advised the court [in a written motion] that Brown 'desire[d] counsel to withdraw from representing him . . . .'"); *United States v. Rivera-Corona*, 618 F.3d 976, 977–78 (2010) ("[Retained counsel] moved to withdraw [after his client expressed a loss of faith in him] and requested that new counsel be appointed."); *Miller v. Blacketter*, 525 F.3d 890, 892 (9th Cir. 2008) (filing withdrawal motion on the day after the defendant "left a message on [counsel's] home answering machine stating

that he was no longer comfortable with her representation and . . . wanted a new lawyer"). There is no reason to think Estrada would not have done the same thing here if Yepiz remained intent on firing him.

For all we know, Yepiz and Estrada may have temporarily resolved their financial differences after Yepiz's letter was rejected. If so, then we must "presume that counsel [continued] to execute his professional and ethical duty to zealously represent his client, notwithstanding the fee dispute." *United States v. O'Neil*, 118 F.3d 65, 71 (2d Cir. 1997). We should assume that Estrada fulfilled his duties given the "'strong presumption' that an attorney's conduct was professionally competent." *Frazer v. United States*, 18 F.3d 778, 786 (9th Cir. 1994) (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984)). Nothing in Yepiz's April 2006 letter suggested that Estrada was unwilling to end the representation or that there was any other conflict that might have warranted the district court's intrusion into the attorney-client relationship. In Yepiz's next two letters to the district court, written three months later, he did not even mention the fee issue. By vacating Yepiz's conviction without knowing why he never renewed his request as a formal substitution motion, the majority flips the presumption that Estrada was competent on its head.[3]

---

[3] As stated, Yepiz knew that his letter was rejected. But the majority appears to assume that Estrada failed to notify Yepiz in a timely manner or refused to honor a request to withdraw. Even if true, Yepiz had a remedy: he could allege ineffective assistance of counsel. Of course, we usually do not consider such claims on direct appeal because the record is inadequate to evaluate them. *See, e.g.*, *United States v. Rahman*, 642 F.3d 1257, 1259 (9th Cir. 2011). But that's all the more reason why we shouldn't disturb the conviction in these proceedings.

Today's decision will place tremendous strain on our already overburdened district courts. The majority's holding means that district courts can't enforce local rules prohibiting represented parties from writing pro se letters to the judge. Such rules exist in every district court throughout the Ninth Circuit. *See* D. Alaska Civ. R. 11.1(a)(1)(3)[A]; D. Ariz. Civ. R. 83.3(c)(2); N.D. Cal. Civ. R. 11-4(c); S.D. Cal. Civ. R. 83.9; D. Guam Gen. R. 19.1(a); D. Haw. R. 83.6(a); D. Idaho Civ. R. 83.6(a)(2); D. Nev. R. IA 11-6 (a); D. N. Mar. I. Civ. R. 83.5(g)(1); D. Or. Civ. R. 83-9(b); E.D. Wash. R. 83.2(d)(2); W.D. Wash. Civ. R. 83.2(b)(4).[4]   In fact, we enforce similar rules in our own court, *see, e.g.*, *United States v. Noriega-Perez*, 467 F. App'x 698, 703 (9th Cir. 2012); *United States v. Ortiz-Martinez*, 593 F. App'x 649, 650 (9th Cir.) (rejecting pro se filing seeking new counsel), *cert. denied*, 135 S. Ct. 2912 (2015), as do other circuits, *see, e.g.*, *United States v. Hunter*, 770 F.3d 740, 746 (8th Cir. 2014) ("It has long been Eighth Circuit policy 'that when a party is represented by counsel, we will not accept pro se briefs for filing.'" (quoting *United States v. Payton*, 918 F.2d 54, 56 n.2 (8th Cir. 1990))).

Until today, we have always afforded district courts great discretion in enforcing these rules because "[a] criminal defendant does not have an absolute right to both self-representation and the assistance of counsel." *United States*

---

**4** The Eastern District of California does not have a specific rule except for capital habeas petitioners, E.D. Cal. R. 191(c), but its rules cite "letters to the Court not suitable for filing" as an example of "received" documents that are "not . . . part of the official record in the action," E.D. Cal. R. 101.  The District of Montana implies such a rule for represented criminal defendants:  "When the right to counsel no longer applies in this court, pro se filings may not be dismissed or stricken on the grounds that the filer was represented by counsel." D. Mont. Crim. R. 44.1.

*v. Halbert*, 640 F.2d 1000, 1009 (9th Cir. 1981). Of course, district courts can't turn a blind eye to conflicts between a criminal defendant and defense counsel under the guise of procedure. When the court is aware of a conflict that potentially could affect a defense counsel's representation, it has a duty to inquire further. *E.g.*, *Garcia v. Bunnell*, 33 F.3d 1193, 1199 (9th Cir. 1994). But "not every conflict or disagreement between the defendant and counsel implicates Sixth Amendment rights." *Schell v. Witek*, 218 F.3d 1017, 1027 (9th Cir. 2000) (en banc) (citing *Morris v. Slappy*, 461 U.S. 1, 13–14 (1983) (rejecting "the claim that the Sixth Amendment guarantees a 'meaningful relationship' between an accused and his counsel")).

Yepiz expressed no concern about Estrada's performance. He did not suggest that counsel's representation would suffer as a consequence of their financial dispute. I agree that because he asked for appointed counsel, the more prudent course would have been for the district court to exercise its discretion and take up his complaint. But the failure to do so under these circumstances is not per se reversible error. By concluding that structural error occurs when a district court fails to inquire into a single pro se letter that is returned to counsel, the majority effectively requires district judges to review and entertain *all* pro se filings submitted by every single represented criminal defendant. This is no small task. For many of our district courts that handle massive criminal dockets, receiving pro se letters is a routine matter. Some defendants in custody are prolific letter writers and, without counsel's help, their messages may be prolix and inscrutable. District courts, no longer safe to rely on the defense bar's professionalism in raising client concerns, will now be pressed to hold hearings whenever criminal defendants write

to them on differences with their counsel, regardless of how seemingly minor.

## III.

The majority's assignment of error to the district court's routine handling of a pro se communication wouldn't be nearly so pernicious if not for its failure to assess harmlessness. Guided by our precedents—which I believe were wrongly decided—the majority holds that when a district court erroneously denies a motion to substitute retained counsel with appointed counsel, it commits structural error. The mistake in this approach stems from confusion about the right at issue.

"The Sixth Amendment's right to counsel encompasses two distinct rights: a right to adequate representation and a right to choose one's own counsel." *Rivera-Corona*, 618 F.3d at 979 (quoting *Daniels v. Lafler*, 501 F.3d 735, 738 (6th Cir. 2007)). These rights are distinct because they arise from different sources. The right to effective counsel is derived from the Due Process Clause's fair trial guarantee and incorporated into the Sixth Amendment based on "our perception that representation by counsel 'is critical to the ability of the adversarial system to produce just results.'" *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147 (2006) (quoting *Strickland*, 466 U.S. at 685). Because the limits of this right are also derived from the goal of a fair—"not mistake-free"—trial, "a violation of the Sixth Amendment right to *effective* representation is not 'complete' until the defendant is prejudiced." *Id.* (citing *Strickland*, 466 U.S. at 685).

"The right to select counsel of one's choice, by contrast, has never been derived from the Sixth Amendment's

purpose of ensuring a fair trial. It has been regarded as the root meaning of the constitutional guarantee." *Id.* at 147–48 (footnote and citations omitted). "Deprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received." *Id.* at 148. Although the right to choice of counsel is subject to qualifications, *see Wheat v. United States*, 486 U.S. 153, 159 (1988), the improper denial of that right, including the right not to have counsel, *see Faretta v. California*, 422 U.S. 806, 821 (1975), is structural error subject to automatic reversal. *Gonzalez-Lopez*, 548 U.S. at 152; *Frantz v. Hazey*, 533 F.3d 724, 734 (9th Cir. 2008).

Here, Yepiz did not seek to *retain* a particular lawyer or proceed pro se. He asked the district court to *appoint* counsel. His request was grounded not in the Sixth Amendment's right to counsel of choice but rather in its "right to the effective assistance of counsel, the violation of which generally requires a defendant to establish prejudice." *Gonzalez-Lopez*, 548 U.S. at 146; *see Wheat*, 486 U.S. at 159 ("[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers."). The Supreme Court has cautioned us not "to confuse the right to counsel of choice—which is the right to a particular lawyer regardless of comparative effectiveness—with the right to effective counsel—which imposes a baseline requirement of competence on whatever lawyer is chosen or appointed." *Gonzalez-Lopez*, 548 U.S. at 148.

In *Rivera-Corona*, the panel cited *Bland v. California Department of Corrections*, 20 F.3d 1469, 1479 (9th Cir. 1994), *overruled on other grounds by Schell v. Witek*, 218 F.3d 1017, 1024–25 (9th Cir. 2000) (en banc), for the proposition that a defendant's request to substitute appointed counsel in place of a retained attorney "implicate[s] the qualified right to choice of counsel."  618 F.3d at 981.  I don't read *Bland* as holding that, let alone "unequivocally" so.  *Rivera-Corona*, 618 F.3d at 981.  At issue was the "right to *discharge* counsel," *Bland*, 20 F.3d at 1472 (emphasis added), not the right to have new counsel appointed.  Bland's retained attorney moved unsuccessfully "to be relieved as counsel."  *Id.* at 1475 (emphasis omitted).  We affirmed habeas relief based on the trial court's denial of that motion. *Id.* at 1472.   Although Bland's retained attorney also expressed his client's wish to have new counsel appointed, *id.* at 1475, that request wasn't at issue because the trial court ultimately appointed counsel when the retained attorney failed to appear at sentencing.  *Id.*

Admittedly, we inconsistently framed the issue as both the right to choice of counsel (which wouldn't require a showing of prejudice) and the right to effective assistance (which would).  But it made no difference how Bland's right was characterized because he "established the requisite prejudice" in any event.  *Id.* at 1479.  In pointing out that "the Sixth Amendment . . . protects [Bland's] qualified right to obtain *retained* counsel of his choice," we "assume[d] Bland was not indigent."  *Id.* at 1477 (emphasis added).

As we explained in *Schell*, the right to choice of counsel is not implicated by an indigent defendant's request for appointed counsel:  "The qualified right of choice of counsel applies *only* to persons who can afford to retain counsel." 218 F.3d at 1025 (emphasis added).  In *Gonzalez-Lopez*, the

Supreme Court echoed this principle, stating that "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." 548 U.S. at 151.

The error in *Rivera-Corona* was compounded in *Brown*, which held that the erroneous denial of a motion to substitute retained counsel with appointed counsel "is a structural error, requiring that convictions be vacated even without a showing of prejudice." 785 F.3d at 1350 (citing *Gonzalez-Lopez*, 548 U.S. at 150). The panel acknowledged "that it is not, strictly speaking, correct to say that the defendant in *Rivera-Corona*, or [Brown], was entitled to, or seeking, *counsel of choice*." *Id.* at 1344. Nevertheless, the panel concluded that the district courts were "really deciding two issues. The first, whether the defendant may *discharge* the attorney whom he retained, implicates the Sixth Amendment right to counsel of choice . . . . [A]t the same time, [the courts were] also considering a request for *appointment* of counsel." *Id.* at 1344–45. Since the first issue involves a right that if violated requires automatic reversal, *Brown* concluded that the ultimate decision was also subject to automatic reversal if erroneous. *Id.* at 1350.

Whatever the logic of that proposition in general, it makes no sense to apply it when the substitution request is for purely financial reasons. The defendant doesn't want to fire his retained counsel independently of having new counsel appointed. The former is incidental to the latter. *See United States v. Mota-Santana*, 391 F.3d 42, 47 (1st Cir. 2004) ("[T]he two [analyses] merge, since defendant and his family ran out of funds to retain other private counsel and defendant sought court appointed counsel."). Here, had the district court found Yepiz indigent and appointed Estrada to continue representing him at public expense, the majority presumably would find no error. *See* C.D. Cal. Gen. Order

13-09 (allowing for appointment of counsel not on Criminal Justice Act Panel to ensure continuity of representation and preserve the interests of economy). Then why find per se reversible error when the consequence of the court's purported error was the continued representation by Estrada? The majority doesn't say.

Before *Rivera-Corona* and *Brown* led us astray, we treated motions to substitute retained counsel with appointed counsel under the standard for appointing new counsel because that was the crux of the request. *Bland* held that "[w]hen reviewing the denial of a motion to substitute [retained with appointed] counsel for abuse of discretion, we consider . . . three factors: '(1) timeliness of the motion; (2) adequacy of the court's inquiry into the defendant's complaint; and (3) whether the conflict between the defendant and his attorney was so great that it resulted in a total lack of communication preventing an adequate defense.'" 20 F.3d at 1475 (quoting *United States v. Walker*, 915 F.2d 480, 482 (9th Cir. 1990)). *Schell*, though overruling *Bland*'s application in habeas cases as insufficiently deferential, confirmed that the standard applied in *Bland* "is the correct methodology for reviewing federal cases on direct appeal." 218 F.3d at 1025 (citing *Walker*). Yet *Rivera-Corona* wrongly held that "the extent-of-conflict review is inappropriate" when a defendant seeks to replace retained with appointed counsel. 618 F.3d at 981. *But see Martel v. Clair*, 132 S. Ct. 1276, 1287 (2012) (explaining that review of substitution motions "generally include[s]" factors such as "the timeliness of the motion; the adequacy of the district court's inquiry into the defendant's complaint; and the asserted cause for that complaint, including the extent of the conflict or breakdown in communication between lawyer and client (and the client's own responsibility, if any, for that conflict)"). *See generally*

*Rivera-Corona*, 618 F.3d at 983–87 (Fisher, J., disagreeing that *Bland* and *Schell* were not controlling but concurring in the result). By wholly conflating two distinct rights—the right to counsel of choice and the right to effective counsel—*Rivera-Corona* and *Brown* forged structural error from harmless mistake.

## IV.

This case illustrates why a conviction shouldn't be set aside when the district court erroneously denies a request to substitute retained with appointed counsel absent a showing of prejudice. Midway through trial, the district court held a hearing to discuss Yepiz's most recent complaints about Estrada. The court made specific findings that Estrada had continued throughout the proceedings to competently represent Yepiz, that he had "participated in the trial," "made objections . . . at the appropriate time," and "properly cross-examined witnesses that ha[d] anything to say that relate[d] to [Yepiz]." Critically, the court found that Yepiz and Estrada "[could] continue to work out" defense strategy. None of these findings is consistent with "the conflict between the defendant and his attorney [being] so great that it resulted in a total lack of communication preventing an adequate defense." *Bland*, 20 F.3d at 1475. In other words, there is no evidence of prejudice.

I respectfully dissent.