Dissent by Judge NGUYEN
*1074 OPINION
NOONAN, Circuit Judge:
Appellants are all alleged to be members or associates of the Vineland Boys (“VBS”), a gang located in Southern California. On November 30, 2005, a grand jury returned a 78-count first superseding indictment charging appellants and approximately forty other individuals with crimes arising out of their membership or association with VBS. Seven of the nine appellants were charged with violating the Racketeer Influenced and Corrupt Organizations Act (“RICO”), and with RICO conspiracy (Counts 1 and 2, respectively), and ail appellants were charged with distribution of narcotics (Count 3). Other charged counts included violent crimes in aid of racketeering (“VICAR”), attempted murder, and possession with intent to distribute cocaine, methamphetaminé, and marijuana.
Trial commenced on August 9, 2006. On October 26, 2008, the jury returned a verdict of not guilty as to five counts, a mistrial as to one count, and a verdict of guilty as to the remaining counts. Appellants’ subsequent motions for judgments of acquittal and new trials were denied by the district court. Appellants—Manuel Yepiz, Jose Luis Mejia, Francisco Zambrano, . Jesus Contreras, Mariano Meza, Sergio Mejia, Gilberto Carrasco, Rafael Yepiz, and Ernesto Mendez—timely appealed their convictions and sentences.
We note at the outset that this case was vigorously litigated over the course of two- and-a-half months. It presented the district court with a gauntlet of complex legal questions, and required it to grapple with unique concerns to courtroom safety and logistics. We are now presented with nearly three dozen distinct legal questions on appeal. These questions have been met by the district court promptly and persuasively- '
In this opinion we resolve (1) appellants’ joint Brady claims, and (2) Manuel Yepiz’s Sixth Amendment Right to Counsel claim. We address the remaining issues in a concurrently filed memorandum disposition.
I. Dependants’ Joint Brady Claims
BACKGROUND
At trial, oné of the government’s cooperating witnesses was Victor Bulgarian. In September of 2006, on direct examination, Bulgarian testified that he was previously arrested for possession and sale of methamphetamine in an unrelated case, and agreed' to cooperate with law enforcement in exchange for a lesser sentence, and a grant of immunity for his testimony as a government witness. Bulgarian testified to having received no benefits from the government in exchange for his testimony. However, on cross-examination, Bulgarian testified to having received $5,000 in cash from the government after .he testified to the grand jury in this case. Defendants noted that this testimony directly contravened a letter the government sent to them asserting that no witnesses received any benefits from the government in exchange for their testimony. The government acknowledged that it was “a glaring mistake,” but argued that the error was cured because defendants had ample opportunity to cross examine Bulgarian on the subject of the $5,000 payment. Defendants did not raise the issue again either at trial or in a post-trial motion.
Approximately three years later, on August 20, 2009, Bulgarian testified in the trial of Horacio Yepiz.[1] On direct examination, Bulgarian once again testified to hav- *1075 tag received no benefit from the government in return for his testimony. On cross examination, Bulgarian testified that since his arrest for drug-related crimes in 2004, he had received roughly $100,000 to $200,000 in cash from five different law enforcement agencies, although he was unable to give an exact figure. He explained that he was able to solicit paid work from these agencies whenever he wanted (“I decide when I want to work, and when I work, I get paid.”). Indeed, he testified to having received $800 for three hours of work the week prior. Appellants now argue that the government violated Brady by failing to disclose the full extent of the benefits Bulgarian received at trial.
Standard op Review
“[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due' process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.” Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). To prevail on a Brady claim, the defendant must show that the evidence was material. Materiality is satisfied when “there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A ‘reasonable probability’ is a probability sufficient to undermine confidence in . the outcome.” United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). This Court reviews alleged Brady violations de novo. United States v. Baker, 658 F.3d 1050, 1053 (9th Cir. 2011), ovemded on other grounds by United States v. King, 687 F.3d 1189 (9th Cir. 2012).
Discussion
The government makes three arguments in support of its contention that it did not violate Brady: (1) defendants waived any Brady claim by failing to raise it at trial; (2) the allegedly withheld information would have been cumulative in light of other impeachment material provided to defendants; and (3) the record demonstrates that Bulgarian received these payments only after the trial in this case.
The government argues that defendants have waived their Brady claim by failing to raise it in the trial court. However, this Court has previously rejected this precise argument. In United States v. Bracy, undisclosed impeachment evidence of a government witness was uncovered for the first time in a later trial of a severed group of defendants. 67 F.3d 1421, 1428 (9th Cir. 1995). The information came to light only after the defendant had filed his notice of appeal, thereby divesting the trial court of jurisdiction over his case. See generally Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982). This Court concluded that “[i]t defies logic to suggest that [the defendant] waived a claim by not raising it before a court that lacked jurisdiction to consider it.” Bracy, 67 F.3d at 1428. This reasoning applies with equal force here given that defendants appealed their case in early 2007, roughly two-and-a-half years before the new evidence was revealed.
, Next, the government presents a litany of impeachment evidence that it produced to defendants, and argues that “additional payments information could hardly have caused the jury to view Bulgarian or his relationship with the government differently or with greater caution.” To the extent that the government argues that its duties under Brady only encompass disclosure of non-cumulative evidence, this Court has previously found this line of reasoning unavailing. Carriger v. Stewart, 132 F.3d 463, 481 (9th Cir. 1997) (“We have held that the government-cannot satisfy its Brady obligation to disclose excul *1076 patory evidence by making some evidence available and claiming the rest would be cumulative.”) (internal citations omitted). Moreover, failure to produce evidence (1) that Bulgarian made hundreds of thousands of dollars assisting law enforcement, and (2) enjoyed a relationship that allowed him to earn benefits whenever he chose, was material despite the effect of other impeachment evidence provided by the government. Indeed this evidence could very well have resulted in the jury disbelieving all of Bulgarian’s testimony, which played an important role in the government’s case. Cf. Benn v. Lambert, 283 F.3d 1040, 1058 (9th Cir. 2002) (“The undisclosed benefits that Patrick received added significantly to the benefits that were disclosed and certainly would have ‘cast a shadow" on Patrick’s credibility. Thus, their suppression was material.”).
The government’s attempts to minimize the significance of Bulgarian’s testimony are not persuasive in light of the record. While some of Bulgarian’s testimony was independently corroborated, it nonetheless played a substantial role in the government’s case-in-chief. In particular, Bulgarian’s testimony was relied upon heavily by the government to show that VBS was a “criminal enterprise” under RICO. Therefore, had the alleged Brady materials been made available to appellants at trial, there is a “reasonable probability” that the result of the proceeding would have been altered.
Finally, the government argues that the record conclusively shows that the benefits Bulgarian testified to receiving were all earned after appellants’ trial, and therefore could not serve as the basis of a Brady violation. The government points to a discovery letter sent to Horacio Yepiz in August of 2009, informing him that since Bulgarian’s testimony in this case in 2006, he had received an. additional $80,000 to $90,000 from the government. However, Bulgarian testified that he may have received as much as $200,000 between 2004 and 2009; therefore a letter stating that- he received roughly half that sum after appellants’ trial in 2006 does not foreclose appellants’ Brady claim.
The government concedes that the facts surrounding benefits paid to Bulgarian are “in dispute.” Likewise, defendants admit that “there are fact-finding gaps in the record with regard to how much Bulgarian was paid, when he received payments, and the purpose of the payments.” Defendants attempt to bridge these “gaps” by requesting that the court simply take judicial notice of Bulgarian’s 2009 testimony at the trial of Horacio Yepiz. However courts may only take judicial notice of facts “not subject to reasonable dispute;” therefore the court DENIES defendants’ motion. Fed. R. Evid. 201; see also Lee v. City of L.A., 250 F.3d 668, 690 (9th Cir. 2001).[2]
In light of the disputed facts surrounding defendants’ Brady claim, we REMAND to the district court so that it may engage in the necessary fact-finding to ascertain whether Bulgarian received benefits that were undisclosed to appellants at the time of trial, and if so, whether Brady was violated as to each convicted count.[3]
*1077 II. Manuel Yepiz’s Substitution of Counsel Claim
BackgRound
Following Manuel Yepiz’s (“Yepiz”) arrest in June 2005, an attorney named Bernard Rosen was appointed to represent him. In November 2005, Yepiz retained Nicolas ' Estrada to replace Rosen. On April 9, 2006, Yepiz wrote a letter addressed “to the Honorable Judge Walters,” which the court received on April 11, 2006. In the letter, Yepiz expressed “great concern” about “financial differences” he was having with Estrada. He stated that Estrada had asked him for $200,000 to proceed to trial, despite having told Yepiz and his family he would only charge an additional $25,000 to $35,000 for trial. He stated that if Estrada “would have been more truthful from the start, [he] would have never hired [Estrada],” because his family could not afford him. Finally, Yepiz noted that he did not want to “waste everybodys [sic] time by waiting [until] the last minute to ask for a new attorney,” that he had only recently been informed of Estrada’s prices, and that he was thus requesting a “panel attorney” now, so that he or she could “prepare for trial and [have] everything [go] as schedule[d].”
The court did not accept Yepiz’s letter, and instead ordered the letter “returned to counsel” along with a Notice of Document Discrepancies (NDD). A checked box at the bottom of the NDD stated that Yepiz’s letter was “NOT to be filed, but instead REJECTED.” The NDD did not indicate the basis for the court’s rejection, and the docket description of the document only indicated that the denial was based on the fáet that “[p]arties should not write letter[s] to Judge.” Yepiz and Estrada subsequently appeared before the court on May 9, 2006 for a hearing on a motion to suppress evidence, though neither Yepiz nor Estrada reasserted Yepiz’s motion for substitution of counsel.
On July 25 and 31, Yepiz wrote two additional letters addressed to Judge Walter asking for an “in camera hearing” to “request the Court to appoint new counsel” on his behalf. He raised several concerns in his letters regarding Estrada’s representation, and the court scheduled a hearing for August 4, 2006 to address them: At the hearing, the court stated that it had received “two letters from 'the de^-fendant,” referring to those letters dated July 25 and July 31. It did not reference Yepiz’s April 9 letter. After discussing several of Yepiz’s concerns, the following exchange took place between Yepiz and Judge Walter:
Yepiz: Okay, Your Honor. And then another thing. I. addressed the Court—I wrote this letter on, April 9th—yes, I believe April 9th. I have it right here. It was returned, it was signed by, I believe, you. and returned.[4] Right here I’m asking for a lawyer because I’m already having problems with [Estrada] as of April 9th. This is not something that happened last week or a few weeks ago, [Yjour Honor, this has been going on.... This is a whole letter right here *1078 signed -by you, yourself, [Y]our Honor, I have it right here in front of me.
The Court: Well, I didn’t sign any letter.
Yepiz: Well, it’s right here.
The Court: I didn’t sign your letter.*
Yepiz: You didn’t sign—oh, you signed the copy of it.
The Court: Your letter that you’re saying that I signed.
Yepiz: My letter, I apologize, you know, I’m not the brightest car in the lot.
The Court: All right. Anything else?
The court then briefly questioned Yepiz about his July 25 letter, but never again acknowledged Yepiz’s April 9 letter. The court held that “the issues raised ha[d] been adequately addressed by counsel” and that Yepiz’s requests for substitution were “untimely, as [they had been] filed on the eve of trial.” The court further stated that because it had received four or five letters from several of Yepiz’s co-defendants who were “all housed together at [a correctional facility],” they amounted to “nothing more than a strategic attempt to delay the trial.” Because it found that a substitution “would necessitate a continuance” of the trial, the court denied Yepiz’s request.
On September 20, 2006—the 23rd day of trial—Yepiz sent a fourth letter to the court that was addressed td Judge Walter. The letter raised several “concerns as to [Yepiz’s] attorney and his representation.” Among other things, it stated that Estrada would not spend $60 to copy a videotape of Yepiz’s arrest and that he feared Estrada had “lost interest to defend [him]” because he had “run out of money.” He stated that Estrada was “constantly harassing]” him for money and his family was “selling their house to pay him,” but that Estrada’s response was “no money [no] defense.” Interpreting Yepiz’s letter as a request for substitution of counsel, the court scheduled a hearing for three days later, where Yepiz clarified that the letter was actually “just a request to get the video” from Estrada, and Estrada agreed to produce it.
STANDARD OP REVIEW
“We review a district court’s denial of a motion for substitution of counsel for abuse of discretion.” United States v. Rivera-Corona, 618 F.3d 976, 978 (9th Cir. 2010). Unlike “most substitution cases” that “arise when an indigent defendant requests new court-appointed counsel in place of an existing appointed attorney,” the present appeal concerns a defendant’s request to replace retained counsel with appointed counsel. Id.
The Sixth Amendment provides that, [i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence.” U.S. Const, amend. VI. This right “encompasses two distinct rights: a right to adequate representation” for all defendants and, for defendants who have retained their own attorney, the right “to be represented by the attorney of [their] choice.” Rivera-Corona, 618 F.3d at 979 (emphasis omitted). The right to counsel of choice includes the constitutional “right to discharge retained counsel,” and a defendant may generally do so “for any reason or no reason” so long as “the substitution, would [not] cause significant delay or inefficiency or run afoul of ... other, considerations,” such as the “fair, efficient and orderly-administration of justice.” United States v. Brown, 785 F.3d 1337, 1340, 1344, 1345, 1346 (2015); Rivera-Corona, 618 F.3d at 980-81. “[D]enial of a defendant’s right to counsel of choice is a structural error, requiring, that convictions be. vacated even without a showing of prejudice.” Brown, 785 F.3d at 1350. Where a “court allows a defendant to discharge his retained counsel and the defendant is financially qualified, the court must appoint new counsel *1079 for him under the Criminal Justice Act” (CJA), at any stage of the proceedings. Id. at 1340; 18 U.S.C. § 3006A.
Disoussion
Yepiz claims the district court abused its discretion when it failed to inquire into his April letter seeking to replace Estrada with court-appointed counsel. We agree. Under this court’s precedent, “the trial judge had a duty to inquire into the problems between” Yepiz’s and Estrada “When they were first raised.” Blacketter, 525 F.3d at 896. The court here failed to conduct any inquiry with regard to Yepiz’s April letter, though it clearly understood it was bound by such a duty given the speed with which it scheduled hearings regarding Yepiz’s July and September letters, each of which were similarly addressed directly to Judge Walter. Yepiz’s failure to submit his letter through the very counsel he was hoping to dischargé, does not negate the court’s duty.
As an initial matter, the government argues that the court need not have addressed Yepiz’s request because it was not properly filed. According to the government, Yepiz’s letter was rejected and not filed because it did not comply with Local Rules 83-2.9.1 and 83-2.11. Those rules prohibit parties who are represented by counsel from acting pro se and from communicating with the judge via letters or phone calls. See C.D. Cal. Civ. L-R 83-2.9.1 & 83-2,11. The NDD rejecting Yepiz’s letter, however, made no mention of these local rules. Indeed, no reason for the rejection was provided on that form. It was only on the electronic version of the docket that any explanation was provided: “[p]arties should not write letter [sic] to Judge.” Thus, no clear explanation as to why Yepiz’s letter was rejected was ever presented-to Yepiz’s counsel, and because the letter and NDD were sent to Yepiz’s counsel and not to Yepiz, Yepiz was given no explanation at all.
Had such an explanation been given to Yepiz, he would have been in a position to properly comply with the local rules: he could have requested that his counsel file a motion asking to withdraw, a motion which his counsel would have been ethically obligated to file. Alternatively, Yepiz could have filed another letter explaining why he was unable to comply with the rules— perhaps his counsel was unwilling or unable to comply with his ethical obligations to file a motion to withdraw, or perhaps Yepiz was unable to contact his counsel at all. Because no explanation was provided, Yepiz was not given notice as to how he could properly present his request for new counsel, and as such, the local rules served to arbitrarily deny Yepiz’s constitutional rights. Under the circumstances of this case, therefore, we reject the government’s argument that the court was excused from its duty to inquire into Yepiz’s request because of Yepiz’s failure to comply with any local rule of procedure.
The government also argues that Yepiz waived his Sixth Amendment right to counsel when he failed to reassert his substitution motion at the May suppression hearing. See United States v. Taglia, 922 F.2d 413, 416 (7th Cir. 1991) (stating that “[i]f a motion is not acted upon, a litigant had better renew it. He may not lull the judge into thinking that it has been abandoned and then, after he has lost, pull a rabbit out of his pocket in the form of the forgotten motion.”). However, the record does not support the government’s claim of waiver.
A constitutional right may generally only be waived “if it can be established by clear and convincing evidence that the waiver is voluntary, knowing, and intelligent,” and we must “indulge every reasonable presumption against waiver of *1080 fundamental constitutional rights.” Schell v. Witek, 218 F.3d 1017, 1024 (9th Cir. 2000). In Schell, we held that the defendant did not voluntarily, knowingly, and intelligently waive his right to counsel when he failed to reassert a request for substitution that the court had overlooked. Id. Instead, we found that because Schell’s attorney had advised him that his motion “must have been denied” and there was “nothing in the record to suggest that Schell knew of the court’s inadvertent error,” he could not have waived the request. Id. While this case presents a slightly different scenario in that we do not know why Yepiz failed to reassert his motion at the May hearing, our conclusion is the same.
. In this case, Yepiz sent his first letter to the court in April 2006, which the court rejected. He then sent two additional letters addressed to Judge Walter requesting substitution of counsel in July 2006. At a hearing to address the July letters, Yepiz stated that the issues he was having with Estrada were “not something that had just happened last week,” but had instead “been going on” since April. In his September letter, Yepiz stated that “[djuring a conversation in April 2006, I explained I had no more money ... [and] [w]e agreed that [Estrada] would withdraw from the case. However, he still remains and I am being repeatedly harassed for money.” Yepiz’s consistent statements that his issues with Estrada had not been resolved suggest that Yepiz did not voluntarily, knowingly, or intentionally waive his motion.
This conclusion is supported by the fact that the NDD failed to put Yepiz on notice that the letter was rejected or how he might rectify the deficiency. For all he knew, as in Schell, the motion “must have been denied.” Schell, 218 F.3d at 1024. We therefore hold that Yepiz did not waive his motion.
While it may sometimes be necessary to remand a case such as this to the district court in order to determine whether substitution of counsel would have “caused significant delay” or impeded the “fair, efficient and orderly administration of justice,” the record here is sufficiently clear to determine, without remanding, that replacing Estrada would not have implicated these concerns. Blacketter, 525 F.3d at 896. The court received Yepiz’s April 2006 letter four months prior to the start of trial. In the letter, Yepiz stated specifically that he “did not want to delay the trial,” and merely wanted to “have the time to get a new lawyer to defend [him] properly,” as provided by the Constitution. Id. The district court later suggested that “five weeks would have been sufficient time” for a substitute attorney to prepare a defense for a different defendant joined in Yepiz’s case, and any counsel appointed to represent Yepiz would have had months to prepare for trial. Because the substitution would not have affected the court’s calendar, Yepiz was entitled to discharge Estrada “for any reason or no reason.” Blacketter, 525 F.3d at 896. If Yepiz still qualified as an indigent defendant at the time he sent his April letter, he was also statutorily entitled to appointed counsel under the CJA. Brown, 785 F.3d at 1346.
We therefore find that the district court abused its discretion when it arbitrarily and without explanation rejected Yepiz’s April 2006 letter. Given the defects in the district court’s handling of Yepiz’s requests, we VACATE Yepiz’s conviction and REMAND for a new trial. Brown, 785 F.3d at 1350.

. Horacio Yepiz was originally joined as a co-defendant of appellants, but was later deemed incompetent and tried separately.

. Defendants also request that this court take judicial notice of a complaint, verdict, and judgment in a state civil negligence case. Defendants have failed to adequately explain how these documents relate to any of their arguments on appeal, and how they meet the standard for judicial notice. MJN at 5 (citing JOB at 76-77). The Court therefore DENIES defendants’ motion for judicial notice as to these documents as well.

. At oral argument, the government conceded that defendants should have an opportunity to litigate their Brady claims by collaterally attacking their conviction under 28 U.S.C. § 2255. However, the government points to *1077 no opinion of this Court holding that a post-conviction motion under § 2255 is preferable to a remand. Indeed, the government stated at oral argument that “it doesn’t make much difference” what mechanism is used. Moreover, defendants would not enjoy the benefit of counsel in a § 2255 proceeding. Given that counsel for defendants are already familiar with the facts surrounding - the Brady issue, the interests of justice and judicial efficiency militate in favor of remanding to the district court.

. While the NDD stipulated that the letter should be returned to counsel, based on Yepiz’s statements, he was aware that the letter had been returned, either because it had been returned directly to him, or because Estrada informed him that it had been returned.